# EXHIBIT L

# Associate Handbook 2006 Addendum

## About this addendum

There have been changes and additions to some of the information in the *Associate Handbook 2005* since it was distributed in July 2005. This addendum follows the topic and page order of the *Associate Handbook 2005*. To make it easier to follow, note the page number listed by each entry in the addendum (with the exception of the "Health care benefits" section, which contains revisions and clarifications to some of the existing benefit plans listed by state). This will be the page where the new information should be included in the *Associate Handbook*. You will need to read the appropriate pages in both the addendum and the *Associate Handbook* to be sure you have the most current information.

You will find included in this addendum:

- Revisions and clarifications to some of the company's policies, including changes to short-term disability (STD) and time away

- Revisions and clarifications to some of the existing benefit plans

- Information about claims procedure

EXHIBIT

28

Marr 7·28·10

PENBAO DOC-631-6969



D00651

**2006 Addendum**
Associate Handbook

## GLOBAL UPDATES

### Personnel Center information

Throughout the handbook, references to the Personnel Center hours should be changed to Monday through Friday from 8:30 a.m. to midnight, Eastern Time. Also, both legacy Bank of America associates and legacy Fleet associates can call the Personnel Center at the same number: 1.800.556.6044. Participants who are hearing-impaired should use the TTY number: 1.888.343.0860.

### Mailing address for Corporate Benefits Committee and Benefits Appeals Committee

The new mailing address is:
Bank of America Corporation
Corporate Benefits Committee
or Benefits Appeals Committee
Bank of America Personnel Center
NC1-003-09-11
901 West Trade Street
Charlotte, NC 28255-0001

### Online benefits information

The Your Benefits Resource Web site (resources.hewitt.com/bankofamerica) is no longer available and the references to this site in the handbook no longer apply. Please visit www.netbenefits.com for more information.

### Changing benefits during the year

Once you choose your benefits during annual enrollment, they remain in effect for the entire calendar year (January 1 to December 31), unless you have a qualified status change during the year. Qualified status changes are described on pages 26 and 27 of the *Associate Handbook*. If you have a qualified status change, you have 31 days from the date of the event to report the change by calling the Personnel Center or going to www.netbenefits.com. If you do not provide notification within 31 days of the qualified status change, you will not be able to make changes to your coverage (including any newly eligible dependents) until the next annual enrollment period.

## CHAPTER 1 — Working at Bank of America

*Page 10 — The following is added after Electronic Mail Policy*

### Blogging

Creation and use of personal Web logs or "blogs" has become more and more common.

While the company respects your right to personal expression, the use of company computers or company time for personal blogs is prohibited.

If you use your own time and equipment to blog, you are discouraged from publicly discussing work-related matters, and you must refrain from disclosing confidential, proprietary, sensitive and/or trade secret information that you have obtained in the course of your employment with the company. You also should exercise respect for your co-workers. Harassment (See Discrimination, Harassment and Sexual Harassment Policy in this chapter) of fellow associates via a personal blog will not be tolerated.

The company, in its sole discretion, will determine whether a blog violates company policies. Should a personal blog violate company policies, disciplinary action, up to and including termination of employment, may result.

*Page 11 — The following information replaces the current associate privacy information:*

### Associate Privacy Policy

Bank of America is committed to the highest standards in its approach to associate privacy. The company respects and understands associates' concerns about privacy and the use of confidential and proprietary associate information. This commitment to associate privacy is described below in the associate information sharing standards.

D00652



To support and enforce this policy, Bank of America depends on Global Human Resources, service providers, managers and associates themselves. Everyone plays an important role. This policy addresses how the company protects the privacy and security of associate information while complying with applicable laws and regulations. The Associate Privacy Policy applies to confidential and proprietary associate information, as defined in this policy, regarding US associates.

### Key terms related to associate privacy

**Confidential associate information:** Associate information is confidential in nature and is intended for limited disclosure on a need-to-know basis. It includes elements such as Social Security number, full date of birth, reason for a leave of absence, etc.

**Proprietary associate information:** Proprietary associate information is organizational in nature and is generally intended for internal use within the bank and among service providers. It is not necessarily unique to an individual and would include elements such as band, job title, manager, etc.

### Associate information sharing standards

Global Human Resources manages associate information on behalf of Bank of America. Internal requests for associate information, including access to information, are governed by the Global Human Resources Information Privacy, Security and Usage Standards, and all requests must be reviewed and approved by Global Human Resources Associate Data & Information Management group. The following standards explain the circumstances under which parties may or may not have access to associate information, as well as how the company protects associate information:

### Information sharing outside the company

Bank of America does not sell or otherwise share confidential or proprietary associate information with outside marketers who wish to offer their own products and services to bank associates. However, Bank of America may offer associates the products or services of outside companies, for example, through the Associate Discount Program. Many associates take advantage of the value of these offerings and may choose to initiate contact with the companies that offer products or services of interest to them.

Bank of America does share confidential and proprietary associate information, as allowable by law, with companies that work for Bank of America in order to provide or administer personnel or associate benefit services, such as health care and retirement benefits. Such companies are required to protect confidential and proprietary associate information and to use the information only to provide the services or fulfill the responsibilities they have been engaged to perform for Bank of America or its associates.

### Information sharing within the company

Bank of America does not share confidential associate information within the company in order to market financial products and services. However, the bank may share proprietary associate information in order to offer associates financial products and services that they may like to know more about. In addition, communications regarding personnel or benefit-related changes may be utilized as an opportunity to inform associates about products and services that may be of interest to them.

Bank of America does share confidential and proprietary associate information (except all banking relationship information), as appropriate, with managers in order to enable them to fulfill their management responsibilities. With the approval of Global Human Resources, the company also shares confidential and proprietary associate information on a legitimate need-to-know basis.

**2006 Addendum**
*Associate Handbook*

Social Security numbers (SSNs): The company is committed to ultimately eliminating the use of Social Security numbers as an associate identifier and to achieving broad organizational understanding about the sensitive nature of Social Security numbers.

Benefit plan information: Bank of America respects and protects the privacy of associate benefit plan information and complies with the Health Insurance Portability and Accountability Act of 1996 (HIPAA). For more information, refer to the "Health care benefits" section of the *Associate Handbook* or "Health Insurance Portability and Accountability Act" on Personnel Online.

*Consumer privacy: Bank of America treats associate employment relationships and associate banking relationships separately. Customer-related information provided to the bank is not used to determine or impact terms or conditions of employment unless such information provides evidence of illegal activity and/or violates *Bank of America's Code of Ethics and General Policy on Insider Trading.* For additional information regarding customer privacy rights, please refer to the Privacy Policy for Consumers.

*Due to legal and regulatory requirements, some lines of business may have associate investment monitoring policies and/or requirements.

Associate responsibilities

Compliance: Associates must comply with all Bank of America policies, procedures, guidelines, statements and conditions of employment relating to associate privacy. Failure to do so may result in disciplinary action up to and including termination.

Accuracy of associate information: Associates have access to their personal data records, such as home address, telephone number, date of birth, marital status and veteran status, through the Personnel Center, Personnel Online, NetBenefits and eWorkplace. Associates are responsible for ensuring that their specific associate information is accurate.

Transmission of associate information: When sending confidential and proprietary associate information either electronically or in paper copy, associates must adhere to the guidelines included in the Corporate Information Security Quick Reference Guide.

Proper disposal of associate information: When confidential and proprietary associate information is no longer needed or the required retention timeframe has passed, information should be properly destroyed or deleted to prevent unauthorized or inappropriate access. Associates must follow the procedures in the Confidential Document Destruction Program.

Personal use of electronic tools: Just as technology allows banking to be more efficient for customers and clients, the Internet also improves the work experience of associates. Consequently, associates are permitted appropriate personal use of the Internet, e-mail and other electronic tools *to meet personal needs that are more conveniently and appropriately accomplished during an associate's normal working day.*

However, associates are expected to act responsibly in managing their use of electronic tools. Such use must not interfere with their work responsibilities or performance, or with responsibilities or performance of others. Refer to the "Internet and intranet policies" and "Electronic mail policy" in the "Working at Bank of America" section of the *Associate Handbook* for more information on prohibited activities. Personal use of the Internet, e-mail and intranet provided by the company is a privilege that may be taken away at any time.

Security practices: Bank of America's foremost commitment is to provide a safe and secure work environment. To that end, the company reserves the right to take certain actions, in accordance with applicable law, to protect the safety and security of associates, customers, suppliers and the company.

D00654

Authorized company personnel may routinely record, monitor and conduct surveillance on company systems. Designated organizations may inspect and/or review Internet, e-mail and intranet usage as allowable by law. They may also use these practices to uncover activity that is illegal, impermissible or inappropriate, such as visiting Web sites with explicit sexual content, hate/racist sites or gambling sites.

Protecting information while working from home: When working from home — either via remote access using Bank of America platforms or by accessing tools available on the Internet at www.bankofamerica.com/associates — associates must adhere to the same information security and privacy policies. The use of applications such as eWorkplace and NetBenefits, which manage personal information such as pay and benefits choices, demands that users safeguard information. Further information is found on the Corporate Information Security Quick Reference Guide.

Escalation of privacy concerns: Associates who have a question or concern about associate information, or who experience what they believe is a violation of the Associate Privacy Policy outlined above, should contact their manager or call the Personnel Center at 1.800.556.6044.

Business units or security investigators who wish to report a possible associate privacy event should contact Corporate Information Security at 1.800.207.2322. Corporate Information Security will document the event and notify Global Human Resources for resolution.

More information

Additional policies and procedures for protecting the security, confidentiality and proprietary interests of customers, associates and the company are set forth elsewhere in the Code of Ethics and General Policy on Insider Trading, *Associate Handbook*, Corporate Information Security Quick Reference Guide and Corporate Information Security Policy. The Bank of America Privacy Policy for Consumers governs the treatment of customer information for associates who are also customers of the bank. Such company policies and procedures continue to apply as currently set forth or as modified in writing in the future.

The Associate Privacy Policy is available on Personnel Online. It also will be posted annually on Flagscape and provided to new hires.

Questions? Call the Personnel Center at 1.800.556.6044.

*Page 13 — Replace the current text under "Equal employment opportunity and affirmative action" with the following:*

Equal employment opportunity policy

From its historical origins to the present, Bank of America has been a recognized leader in promoting diversity. Fostering an environment that recognizes, respects and values our different backgrounds and talents is expected of all associates and has a direct effect on the company's success. Creating and maintaining an inclusive work environment, free of unlawful discrimination or harassment, merits special attention when describing what is expected of all Bank of America associates.

Bank of America affirms its commitment to ensure equal employment opportunity in policy and in practice. Quite simply, our company is committed to providing equal employment opportunities and will not tolerate discrimination or harassment on the basis of race, color, religion, sex (including pregnancy, childbirth or related medical condition), gender, gender identity, sexual orientation, national origin, age, ancestry, disability status or veteran status. We also do not tolerate discrimination or harassment on other bases, such as medical condition or marital status, as prohibited by law. Associates at every level are encouraged to demonstrate a personal commitment to promoting diversity and equal employment opportunity and understand that doing so is foundational to our culture.

D00655

**2006 Addendum**
Associate Handbook



## CHAPTER 2 — Benefits overview

### Benefits at a glance

*Page 22 — The following replaces the first bullet in the "Military leave" row of Figure 2.1:*

You may serve with the US uniformed services (generally for up to five years) and return with job protection, as provided by law.

### Eligibility for health and wellness and insurance benefits

*Page 25 — The following items are added to the list of benefits that are automatically provided by the bank in the last section of the first column:*



- Leaves of absence
- Occasional illness days

### Status changes — your options and responsibilities

*Page 27 — The following is added under the "Status changes — your options and responsibilities" section:*

When retroactive changes to medical coverage are required (such as upon receipt of a Qualified Medical Child Support Order), the retroactive change can go back no longer than 60 days.

## CHAPTER 3 — Health and wellness benefits

### When health care coverage ends

*Page 35 — The following is deleted from the second paragraph in the "When health care coverage ends" section:*

However, in 2005, associate coverage for legacy Fleet associates who are retiring ends at the end of the pay period in which the last day of employment occurs.

D00656

# Health care benefits

*Page 47 — The following is added under the "Exclusions and limitations" section of Figure 3.1:*

| Type of service or supply | Aetna Choice II PPO Blue Cross Blue Shield PPO | | Aetna Select EPO Blue Cross Blue Shield EPO and Regional HMOs/EPOs listed in Figure 3.0 |
|---|---|---|---|
| | In-network | Out-of-network | |
| Hearing aids | For all plans, hearing aids are covered up to a $1,000 maximum once every 36 months | | |

## Revisions/clarifications to existing benefit plans

The following tables show changes that have been made to existing benefit plans since the *Associate Handbook* was published.

| Health plan option (all markets) | 2006 benefit changes |
|---|---|
| Aetna Choice II PPO[1] | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| Aetna Select EPO[2] | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| BCBS EPO[3] | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| BCBS PPO[4] | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| BCBS Out-of-Area[5] | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| BCBS High Deductible[5] | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |

[1] Not available in California and Hawaii
[2] Not available in Alaska, Hawaii, Iowa, Maine, Massachusetts, Montana, Nebraska, New Hampshire Rhode Island, upstate New York and Vermont
[3] Not available in California, Florida, Georgia, Hawaii, Illinois, Montana and South Carolina
[4] Not available in Hawaii and Montana
[5] Not available in Hawaii

**2006 Addendum**
Associate Handbook



Please note that details about the plans in the table below are not available in the *Associate Handbook*. Please refer to the plan materials you received separately for details about these plans.

| Health Plan Option and Market | 2006 benefit changes |
|---|---|
| **CALIFORNIA** | |
| Kaiser HMO Northern California and Southern California | • Prescription drugs/retail preferred and generic supply limit changed from 100 days to 30 days<br>• Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order generic copayment changed from $10 to $20<br>• Prescription drugs/mail order preferred brand copayment changed from $20 to $50 |
| Health Net | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| **CONNECTICUT** | |
| CIGNA Network Open Access HMO | • Name changed from CIGNA Open Access HMO<br>• Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| **FLORIDA** | |
| BCBSFL BlueCare HMO | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50<br>• Mental health/chemical dependency vendor: CIGNA Behavioral Health |
| Capital Health HMO | • MRI, PET and CT scans changed from 100% covered to $100 copayment |
| **GEORGIA** | |
| Kaiser HMO Georgia (CCO] and Kaiser CCO GA | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $60 to $75 |
| BlueChoice HMO Georgia | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| **HAWAII** | |
| HMSA Hawaii PPO | • Emergency room out-of-network changed from 100% covered to 90% |
| Kaiser HMO Hawaii | • Primary care office visit copayment changed from $10 to $14<br>• Specialist visit copayment changed from $10 to $14<br>• Lab changed from 100% covered to 90%<br>• Outpatient surgery copayment changed from $10 to $14<br>• Mental health outpatient copayment changed from $10 to $14 |

2006 Addendum
Associate Handbook

| | |
|---|---|
| **ILLINOIS** | |
| HMO Illinois (BCBS) | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/retail nonpreferred brand copayment changed from $35 to $40<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50<br>• Prescription drugs/mail order nonpreferred brand copayment changed from $70 to $80 |
| **MAINE** | |
| CIGNA Network Open Access HMO | • Name changed from CIGNA Open Access HMO<br>• Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| **MASSACHUSETTS** | |
| Tufts Health Plan/<br>CIGNA CareLink OA Plus* | • Replaces Tufts Health Open Access EPO<br>• Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| **MID-ATLANTIC** | |
| Kaiser HMO Mid-Atlantic | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $20 to $50 |
| **NEVADA** | |
| Health Plan Nevada HMO | • Out-of-pocket maximum changed from $5,200 (individual) to $5,300 (individual) |
| **NEW HAMPSHIRE** | |
| CIGNA Network Open Access HMO | • Name changed from CIGNA Open Access HMO<br>• Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| **NEW JERSEY** | |
| CIGNA Network Open Access HMO | • Name changed from CIGNA Open Access HMO<br>• Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| **NEW MEXICO** | |
| Presbyterian EPO New Mexico | • Mental health/chemical dependency vendor: CIGNA Behavioral Health |

* In 2005, Tufts and CIGNA formed an alliance called CareLink. Effective January 1, 2006, this alliance will enable
associates who live in Massachusetts and enroll in CIGNA to continue to access the Tufts provider network, while
also allowing them to use CIGNA providers who participate in the CIGNA Open Access Plus network nationwide.

D00659

**2006 Addendum**
Associate Handbook



| NEW YORK | |
|---|---|
| Independent Health EPO and MVP Select Care EPO | • Eliminated for 2006<br>• BCBS EPO has nearly the same provider network as Independent Health EPO and MVP Select Care EPO |
| CIGNA Network Open Access HMO | • Name changed from CIGNA Open Access HMO<br>• Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50 |
| **OREGON** | |
| Kaiser HMO Northwest | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50<br>• Mental health/chemical dependency inpatient copayment changed from $200 to $250 |
| **SOUTH CAROLINA** | |
| BlueChoice Health Plan | • Name changed from Companion HMO South Carolina<br>• Mental health vendor: CIGNA Behavioral Health |
| **TEXAS** | |
| Scott & White HMO | • Prescription drugs/retail changed from a $50 maximum copayment to lesser of $50 or 50%<br>• Prescription drugs/mail order changed from a $50 maximum copayment to lesser of $100 or 50%<br>• Out-of-pocket maximum changed from $1,000 single/$2,000 family to $3,000 single/$6,000 family |
| **VIRGINIA** | |
| Optima HMO Virginia | • Mental health/chemical dependency vendor: CIGNA Behavioral Health |
| **WASHINGTON** | |
| Premera Blue Cross EPO | • Plan eliminated for 2006<br>• BCBS EPO has same provider network as Premera Blue Cross EPO |
| Group Health Coop HMO (East & West) | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order generic copayment changed from $30 to $20<br>• Prescription drugs/mail order preferred brand copayment changed from $60 to $50<br>• Inpatient mental health/chemical dependency changed from 100% covered to a $250 copayment |
| Kaiser HMO Northwest | • Prescription drugs/retail preferred brand copayment changed from $20 to $25<br>• Prescription drugs/mail order preferred brand copayment changed from $40 to $50<br>• Mental health inpatient benefit changed from a $200 copayment to a $250 copayment |



**2006 Addendum**
Associate Handbook



Occasional illness days

*Page 92 — The following is added as the last paragraph of the "Occasional illness days" section:*

If you are unable to work for more than seven consecutive calendar days, you must initiate a leave of absence. See the short-term disability section on page 122 for details.

Claiming your STD benefits

*Page 94 — The following replaces the section called "Claiming your STD benefits":*

In order to receive STD benefits, you must make a claim for STD benefits. As soon as you become aware of an illness or injury that may cause you to be absent from work for seven consecutive calendar days or more, you must notify your manager and call the Personnel Center. You will be sent instructions on how to make a claim for STD benefits.



To make a claim for STD benefits, you and your physician will need to provide medical documentation to substantiate your disability. You will need to sign an authorization permitting the STD administrator to contact your physician directly concerning your disability. To avoid an interruption in your pay, you and your physician must submit the medical documentation within 15 days of the date your absence begins. *To be eligible to receive STD benefits, you must submit medical evidence substantiating your disability within 45 days of the beginning of your absence from work.* (If you are incapacitated or otherwise unable to provide medical documentation by this deadline due to circumstances beyond your control, you can submit a claim for STD benefits after this deadline, but in any event no later than 90 days after the date your absence begins.) If medical evidence is not provided by these deadlines, you will not be eligible for STD benefits.

STD benefits are only payable for the period you are employed by Bank of America. See "STD benefits" above.

Thus, if your employment ends before the deadline for making a claim for STD benefits, you can still make a claim for STD benefits, but only for the period of time before your employment ended. For example, if an associate's employment ends 40 days after the beginning of the absence, the associate may submit a claim for STD benefits until 45 days after the absence begins, but any STD benefits will only be payable for the first 40 days of the absence.

Please also see the sections "Absences in general" and "Leaves" later in this Handbook for additional information about leaves. You may call the Personnel Center if you have general questions about STD.

Associate supplemental life insurance

*Page 103 — The following note is deleted under the "Associate supplemental life insurance" section:*

Note: If you live in Texas, your total group life insurance coverage through Bank of America may not exceed the greater of seven times compensation or $250,000, under applicable law.

*Page 103 — The words "by more than one level" are added after "increase coverage" in the second paragraph under the "Enrollment" section so that the paragraph reads:*

During future annual enrollment periods or when you have a qualifying event (as described in the "Benefits overview" chapter), if you elect coverage for the first time, increase coverage by more than one level or elect coverage over $500,000, you must provide evidence of good health.

*Page 107 — The following is added as the second paragraph in the Dependent Life Insurance section:*

For the purpose of the plan, Dependent means your spouse, domestic partner or eligible dependent child except for a person who is covered under the Bank of America Group Life plan as an associate.



D00661

**2006 Addendum**
Associate Handbook



## CHAPTER 4 — Time away

*The following section is inserted between "Purchased time off" on page 121 and "Leaves" on page 122:*

### Absences in general
Attendance policies may be established by your business unit. Even if you're eligible for occasional illness or other sickness benefits, your medical absences may be counted under your unit's attendance policy. However, absences that are protected under family or medical leave laws or any other laws won't be counted under your unit's attendance policy. Make sure you understand your unit's policy and if you have any questions about it, see your manager.

For all absences including leaves, you must notify your manager in accordance with your unit's attendance policy and are subject to discipline up to and including termination if you fail to do so. Also, if you do not report to work for two or more consecutive days and fail to notify your manager of your absence, the company will assume that you have voluntarily resigned and your employment will be terminated accordingly.

You may also have to provide medical evidence regarding your absence. The company has the discretion to determine whether such evidence is acceptable to the company. Failure to provide acceptable medical evidence may also result in termination of employment.

This applies to all absences including leaves and will be applied in accordance with all applicable laws.

### Eligibility

*Page 122 — The following bullet is added to the end of the list of bullets under "Eligibility":*

* Be aware that your Bank of America IT system access will be revoked on the effective date of your leave.

### Going on leave

*Page 125 — The following bullet is added to the end of the list of bullets under "Going on leave":*

* Also, during your leave, you need to report regularly to your manager on your status and intent to return to work.

### Returning to work from leave

*Page 127 — The words "an unpaid" are added in front of "personal leave" in the first paragraph of the middle column so that the paragraph reads:*

If you do not return from one of the leaves mentioned above (other than a medical leave) within 26 weeks from the date your leave began, you may be separated from the company, unless you request, and your manager approves, an unpaid personal leave.



## CHAPTER 6 — Leaving Bank of America

### Retirement policy

*Page 178 — The following paragraphs should be added to the beginning of the "Retirement policy" section:*

If you meet the Rule of 60 when you leave the company, you may be eligible for post-retirement medical, dental and vision benefits at full cost. The Rule of 60 applies when employment ends for a full-time or part-time associate who leaves Bank of America any time after satisfying both the following requirements:

• The associate has completed 10 years of vesting service as defined under the Bank of America Pension Plan.
• The sum of the associate's age and years of vesting service (both expressed in years and months) is 60 or more.

If you leave the company on or after January 1, 2006, and meet the Rule of 60, you are not considered a retiree unless you meet other criteria under the company's retirement policy in effect at the time you stopped working.

### Medical, dental and vision coverage

*Page 179 — The following text replaces the current text under "Medical, dental and vision coverage":*

If you left Bank of America under the Rule of 60 on or after January 1, 2006, and you are eligible for retiree health coverage, you can enroll yourself and your eligible dependents upon termination of employment. You may waive bank-sponsored retiree medical, dental or vision coverage and reenroll during a future annual enrollment period or within 31 days of a qualified status change by calling the Personnel Center. To reenroll in a Bank of America retiree medical plan, you will be required to provide proof that you and each eligible dependent you want to enroll have been covered under another medical plan (other than Medicare) for the previous continuous 12 months.

Except as provided above, if you are a Bank of America retiree, a former BankAmerica retiree or a former Nations-Bank retiree, you retired before January 1, 2003, and were not offered or did not enroll in Bank of America retiree medical coverage, or dropped the retiree Bank of America medical prior to January 1, 2006, you may not enroll in Bank of America retiree medical coverage.

Please note that other special rules may apply to certain retiree groups. If you have questions about whether any special rules apply to you, please call the Personnel Center at 1.800.556.6044 (TTY number: 1.888.343.0860).



D00663



## 2006 Addendum
Associate Handbook

For most Bank of America retirees, the monthly cost of health care coverage as a retiree will be significantly greater than the cost as an associate. Contact the Personnel Center to get an estimate of the cost of your monthly retiree health care coverage.

If you or a dependent is eligible for Medicare, benefits under a Bank of America medical plan will be calculated and paid as if the participant were enrolled in both Parts A and B of Medicare, and Medicare pays as primary. It is imperative that you enroll in Medicare Part B when first eligible to receive maximum benefits under the Bank of America retiree medical plan.

If you are enrolled in medical, dental or vision coverage or the health care reimbursement account when you retire, you will receive a COBRA enrollment package from the COBRA administrator. You have the option of first electing COBRA before enrolling in the bank's retiree health plans. In some cases, premiums for COBRA coverage may be less than premiums for the retiree plans available to you; however, COBRA coverage only lasts for 18 months. If you defer enrollment in retiree health care coverage, and you enroll in continuation coverage through COBRA, you will be eligible to participate in the retiree medical, dental or vision plans when your COBRA coverage ends.

### Changing coverage after retirement

In general, you may change from one medical, dental or vision plan to another only during an annual enrollment period. (Some retirees in special plans of predecessor employers cannot switch plans.)

In addition, as of January 1, 2006, you may drop your current retiree medical, dental or vision coverage during an annual enrollment period or within 31 days of a qualified status change, and reenroll at a future annual enrollment period or within 31 days of a qualified status change. To reenroll in a Bank of America medical plan, you and each dependent you want to enroll must have had medical coverage (other than Medicare) continuously for the 12 months preceding the month coverage begins.

For example, if your spouse works and has medical coverage through his or her employer, your spouse may be able to enroll you as a dependent, and you could drop your Bank of America medical coverage. If you later change your mind, or your spouse stops working, your can reenroll in Bank of America medical coverage during annual enrollment, or within 31 days of the date your spouse ceases employment (a qualified status change).

### Special enrollment provisions for certain groups

The following special provisions apply to certain retiree groups:

* Fleet Capital Corporation, Connecticut Bank and Trust, Maine National Bank, Bank of New England, Buffalo, MultiBank and Pioneer retirees must stay in a retiree medical plan. If you cancel coverage, you are not eligible to reenroll.
* NatWest retirees have a one-time opt-out rule. If enrolled, you may cancel coverage. However, if you reenroll in a retiree plan and cancel again, then you are not eligible to reenroll a second time.
* If you are a Summit retiree, you cannot reenroll if you cancel retiree coverage except if you retired from Summit, waived retiree coverage at that time and then were rehired as an active associate. In that case, you will be subject to the retirement rules in effect for your benefit group when you retire again.

D00664  15



**2006 Addendum**
Associate Handbook

*Page 185 — The words "on severance on or before April 1, 2006" are added after "For legacy Fleet associates" in the third paragraph under the Benefits section. This change is effective April 2, 2006, and the paragraph reads:*

For legacy Fleet associates on severance on or before April 1, 2006, severance pay under the Separation Pay and Benefits Plan of FleetBoston Financial Corporation is based on completed continuous years of service. Partial years of service are determined in one-month increments and credited to associates as they complete each month of continuous service. If you had a break in service of less than one year, you will receive credit for service prior to the break. If your break in service is greater than one year, you *may* receive credit for prior service. Please contact the Personnel Center at 1.800.556.6044 for the determination.

## CHAPTER 7 — ERISA

### Review procedure

*Page 192 — The following should replace the second sentence of the first paragraph under the "Review procedure" section:*

You have 60 days (180 days in the case of disability benefit claims) from the time you're notified of the denial of your claim to request review (or, if no notice of denial has been received, you have 150 days from the filing of the initial claim to request review). If you fail to file a request for review within the required time period, you are considered to have permanently waived and abandoned your claim and you may not refile it.

*Page 192 — The following is added at the end of the second-to-last paragraph in the third column:*

You must bring any civil action for benefits no later than one year following the final decision on your claim under these claims procedures. If you fail to bring a civil action within the required time period, you are considered to have permanently waived and abandoned your claim and you may not reassert it.







This addendum is a Summary of Material Modifications to the Bank of America benefit plans described in the Associate Handbook 2005, except for the Retirement Plans chapter which is now contained in a separate supplement. Except as modified in this addendum, the 2005 edition of the Associate Handbook remains in effect for 2006. References to the Associate Handbook include this addendum. The changes described in this addendum are effective as of January 1, 2006. This material, along with the Associate Handbook, together describe the benefit plans as revised and in effect on and after January 1, 2006.

This addendum supersedes and replaces any prior communications, policies, rules, practices, standards and/or guidelines to the contrary, whether written or oral.

For convenience, we use the terms "Bank of America Corporation," "Bank of America" and "company," because various companies throughout Bank of America use this addendum and the Associate Handbook. The use of these terms in these materials or in any other publication does not mean you are an employee or retiree of Bank of America Corporation.

Bank of America may modify, suspend or terminate any plan, program, policy or guideline described in this addendum or the Associate Handbook at any time. The company also retains the discretion to interpret any terms or language used in this addendum or the Associate Handbook.

If there is a discrepancy between the information in this addendum or the Associate Handbook and the terms of the official plan documents, the official plan documents govern.

Please keep this addendum with your other Bank of America benefit plan materials so that you have up-to-date information on your benefit plans.

D00666

# EXHIBIT M

# REDACTED

You must furnish written evidence of the continuance of the disability to the insurance company at its request.

The insurance company, at its own expense, has the right and opportunity to examine any associate whose injury or disease is the basis of a claim when and as often as it may reasonably require during the period for which that associate claims benefits.

**Evidence of other income**
If you are eligible for other sources of income, you must state the amount of those other income benefits and provide proof, satisfactory to the insurance company:
• That you have applied or reapplied for these other sources of income
• That you have not subsequently waived or transferred these other income benefits.

The insurance company has the right to require satisfactory proof of your monthly income. Such proof may include examination of your business and personal financial records. Your financial records may be examined as often as the insurance company requires.

If satisfactory documentation is not provided within 60 days after the date it is requested, the insurance company may deny your claim.

You cannot bring any action at law or in equity to recover on any group policy after three years from the time written proof is required.

**Monthly LTD benefits**
If your claim is approved, your monthly long-term disability benefit depends on which of the following coverage options is in effect when you become disabled:
• 50% of your monthly pay
• 60% of your monthly pay
• 60% of the sum of your monthly pay and ½ of your eligible bonus amount.

If you are salaried, your monthly pay is equal to $\frac{1}{12}$ of your annual salary on the day you become disabled. If you are not salaried, your monthly pay is equal to your pay for your weekly projected average hours (entered as scheduled hours on the payroll system), multiplied by 52 and then divided by 12. If you are a commissioned associate, your monthly pay will reflect your draw and/or salary, plus 100% of commissions, averaged for the 12 full calendar months preceding the date your disability began, or from the date of employment, if less than 12 months.

Your eligible bonus amount is defined in the "Benefits overview" chapter earlier in this handbook. Your eligible bonus amount for purposes of determining your LTD benefits is listed in your annual enrollment materials for the year your disability began.

**Example:** Suppose you become disabled on September 1, 2005. You are eligible for LTD benefits after 26 weeks of disability, so the first day you are eligible to receive LTD benefits is the 183rd day after your disability began, or March 2, 2006. For 2005, you elected LTD coverage of 60% pay plus eligible bonus. Your monthly LTD benefit is based on:
• Your monthly rate of pay on September 1, 2005, plus
• ½ of your eligible bonus amount for 2005 coverage (the year disability commenced), which is shown on the annual enrollment materials you received in fall 2004.

Your monthly long-term disability benefit will be reduced by certain other income sources as described below. The maximum monthly long-term disability benefit for 2005 is $30,000 before any reduction for other income sources.

If you selected either 60% of pay or 60% of the sum of pay and eligible bonus, the minimum monthly benefit will not be less than 10% of the monthly benefit before reduction for other income sources, or $100, whichever is greater. However, if you are already receiving 100% of salary through an accumulated sick leave plan, the minimum monthly benefit will not be payable.

Your monthly benefit will be reduced by 50% of your earnings from working while disabled. In addition, during any period of disability, the total of the monthly benefit, plus any income earned while disabled, cannot exceed 100% of your "indexed predisability monthly earnings." In either of these cases, the minimum monthly benefit will not apply.

**3**



EXHIBIT
29

**Benefits overview**
Eligibility for health and wellness
and insurance benefits

# REDACTED

## Coverage if you change to an hourly position

If you change from a full-time or part-time position to an hourly position, you are no longer eligible for health and welfare benefits. Your coverage for those benefits ends on the last day of the month in which your status changes, unless the change occurs on the first day of the month. If your status change does occur on the first day of the month, your coverage ends on the last day of the previous month.

If you are enrolled in medical, dental or vision coverage or the Health Care Reimbursement Account, you may elect to continue each of these coverages under COBRA (the Consolidated Omnibus Budget Reconciliation Act of 1985). Please refer to the "Continuation and conversion coverage" section of the "Health care benefits" section of this handbook.

## Annual base pay

For certain benefits, your *annual base pay* is used to calculate your coverage amount. Your annual base pay is your annual pay rate, rounded to the nearest dollar.

Your base pay as of the date used for annual enrollment (usually in August of the year before your new annual enrollment benefits take effect) is used to determine the cost of purchased time off.

Your current base pay is used to determine the cost and coverage amounts of associate life, accidental death and dismemberment, and long-term disability insurance. This means that if your salary changes after the date used for annual enrollment, or during the plan year, your coverage amounts and costs for these benefits will be adjusted to reflect your new annual base pay.

If you are a salaried full-time or part-time associate, your annual base pay is 12 times your monthly salary rate.

If you are a full-time or part-time associate paid on a positive time reporting basis, your annual base pay is equal to 52 times your weekly projected average hours, times your hourly rate. Your weekly projected average hours are entered as weekly scheduled hours on the company's payroll system.

If you are a commissioned associate, the company will determine an annual base pay for you for benefits purposes.

For global assignees whose home country is the United States, the definition of annual base pay does not include any allowances or special payments associated with an international assignment.

## About your eligible bonus amount

The calculation of bonus for associate supplemental life insurance, accidental death and dismemberment insurance and long-term disability insurance is based on bonuses and/or incentives prior to the annual enrollment period and designated as eligible by the company. Your eligible bonus amount remains fixed for the plan year.

For example, your eligible bonus and/or incentives for performance year 2003 (even if received in 2004) would appear as your eligible bonus amount in the annual enrollment materials you received in fall 2004 for your coverage in 2005.

**Note:** If you are a legacy Fleet associate, your eligible bonus amount for 2005 coverage is based on bonuses and/or incentives received in 2003, as shown in your personalized enrollment materials.

## Eligible dependents

You may enroll your dependents in some of the benefit plans offered to you. No person may be covered as a dependent of more than one Bank of America associate under particular types of coverage. For purposes of your benefits, the following definitions apply:
• **Spouse:** Your spouse is your legally married spouse as recognized under applicable state law. *

---

* In general, same-gender spouses are treated like opposite gender spouses under Bank of America's welfare benefit plans to the extent permitted under applicable law. However, in order to correctly report federal income taxes, a same-gender spouse who is not a tax dependent must be enrolled as a "domestic partner." If you legally marry a same-gender individual in a state that permits the marriage, but you live in or move to a state that does not recognize the marriage, that individual will still be eligible for coverage as a domestic partner.

28

# EXHIBIT N

AUG 27 2008 15:48 FR BANK OF AMERICA MTG925 855 2189 TO 918662479190    P.02
08/26/2008   11:29   FAX 7 1252595205

# Bank of America ◢◢◢

**Borrowers Protection Plan®**

PROTECTION PLAN SERVICES
NC4-105-02-09
P.O. Box 21848
Greensboro, NC 27420

**DISABILITY INITIAL BENEFIT FORM**

TO EXPEDITE YOUR CLAIM,
FAX TO 1.336.805.2690

FOR QUESTIONS, CALL
TOLL FREE 1.998.365.4832

**Protected Borrower's Report ~ Borrower must complete all information in this section.**

1. Loan Account Number(s) *6838063789A1*    *65422838144 1*
2. Borrower's Full Name *BILL L. MARR*    Date of Birth *5-26-7?*
   Address *1004 SANDWICK WAY*
   City *FOLSOM*    State *CA*    Zip Code *95630*    Telephone *(916) 240-3400*
3. Occupation *VICE PRESIDENT / MLO*
4. Employer's Name *BANK OF AMERICA MORTGAGE*
   Address *10850 WHITE ROCK RD. SUITE 102*
   City *RANCHO CORDOVA*    State *CA*    Zip Code *95670*    Telephone *(916) 861-9?5?*
5. If your claim is eligible and benefits available exceed the amount due on your loan, may we put the excess
   funds in your Bank of America checking account? ☒ Yes ☐ No
6. If yes, please sign your name and list your Bank of America checking account number below.

   _____    *2740 1-61022*
   (Your Signature)                   (Your Checking Account Number)

**INSTRUCTIONS - Please read before filling out this claim form.**

1. There is a waiting period. You must be disabled and under the care of a licensed physician for at least 30
   consecutive days before your claim is eligible for consideration. SECTION 1 and SECTION 2 must not be
   completed until after the waiting period has been satisfied. Completion prior to the end of the waiting period will
   require a new form be completed.
2. Please sign and date the enclosed HIPPA COMPLIANT CONDITIONAL AUTHORIZATION and return it with the
   completed claim form.
3. Please review your Borrowers Protection Plan Addendum under the Disability section for the full details on
   protected events.

## DISABILITY BENEFIT INFORMATION

**SECTION 1 Borrower must complete, date and sign this section.**

1. Date you were first unable to work entirely because of present disability *7/21/08*  (mm/dd/yyyy)
2. Date symptoms of this sickness first appeared or date of accident *7/21/08*  (mm/dd/yyyy)
3. Have you returned to regular or light duty work? ☐ Yes ☒ No
   If yes, date returned to work _____/_____/_____ (mm/dd/yyyy)
   If no, date you expect to return to work _____/_____/_____ (mm/dd/yyyy)
4. Are you under the continuous care of a licensed physician (other than yourself) as a result of your disability?
   ☒ Yes ☐ No



EXHIBIT
**30**
Marr 7-28-10

PLEASE CONTINUE ON REVERSE SIDE

BPP INIT 0IS (07/06)

D00808

AUG·27 2008 15:48 FR BANK OF AMERICA MTG925 855 2189 TO 918662479190          P.03

**SECTION 1 (Continued) Borrower must complete, date and sign this section.**

5    List all licensed physicians who treated you for this disability, as we may need to contact them.

| PHYSICIAN'S NAME(S) | TELEPHONE NUMBER(S) | DATE(S) OF TREATMENT |
|---|---|---|
| PHIL LUGO | 916-817-3700 | |

**BORROWER'S AUTHORIZATION: I** _Bill Marr_ (print name) CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I AUTHORIZE ANY EMPLOYER OR OTHER ORGANIZATION, OR PERSON HAVING ANY RECORDS, DATA OR INFORMATION CONCERNING THIS CLAIM TO FURNISH SUCH RECORDS, DATA, OR INFORMATION TO BANK OF AMERICA CORPORATION OR ITS AUTHORIZED REPRESENTATIVE AS REQUESTED  I UNDERSTAND IN EXECUTING THIS AUTHORIZATION, I WAIVE THE RIGHT FOR SUCH INFORMATION TO BE PRIVILEGED. A PHOTOCOPY OF THIS AUTHORIZATION SHALL BE CONSIDERED AS EFFECTIVE AND VALID AS THE ORIGINAL.

Borrower's Signature X _____          Date  8 6 08  (mm/dd/yyyy)

**SECTION 2 Physician's Statement – The physician that _first_ considered you unable to work must complete, date and sign this section.**

1.   Patient's name  Bill Marr
2.   Diagnosis  Stress Reaction - Depression - anxiety - ocd     300.3
     If disability is due to pregnancy, are there any complications?  ☐ Yes  ☒ No
3.   Date of onset  7 25 08  (mm/dd/yy)
4.   When did patient first consult you for this condition?  7 25 08  (mm/dd/yyyy)
5.   Date(s) of treatment for this condition  7 25 08  8 8 08  / /  (mm/dd/yyyy)
6.   Dates of total continuous disability  From  7 25 08  Through  9 1 08  /  (mm/dd/yyyy)
7.   Probable further total disability should not exceed 1 2 ③ 4 5 6 7 8 9   ☐ Weeks ☒ Months ☐ Permanent
8.   Physician's name  Phil M. Lugo M.D.
     Signature X _____          Date  8 8 08  (mm/dd/yyyy)
     Street  2575 Ct 1 Bidwell St          Telephone  (916) 817-3700
     City  Folsom          State  CA   Zip Code  95630

**SECTION 3 Employer's Statement – Employer must complete, date and sign this section. (If you are self-employed, you must complete, date and sign this section)**

1.   Employee's Starting date  /  /  (mm/dd/yyyy)
2.   Date employee ceased to work entirely  /  /  (mm/dd/yyyy)
3.   Date employee resumed any work  /  /  (mm/dd/yyyy)
4.   Was the employee absent without pay in the 90 days before ceasing work due to the disability?  ☐ Yes  ☐ No
     If yes, did you still consider them a full-time employee?  ☐ Yes  ☐ No
5.   How many hours per week did the employee work? _____
6.   Name of Employer completing this section _____          Title _____
     Signature X _____          Date  /  /  (mm/dd/yyyy)

**IMPORTANT TAX INFORMATION:** Benefits provided by the Borrowers Protection Plan and Line Protection Plan may reduce the amount of interest reported to the IRS on form 1098. Consult a tax advisor regarding the tax impact of benefits.

**PLEASE SIGN AND DATE THE ENCLOSED HIPPA COMPLIANT CONDITIONAL AUTHORIZATION**

** TOTAL PAGE.03 **

D00809

# EXHIBIT O

May 26 09 03:13p     Bill Marr                    916-240-3400                    p.1



**Bank of America** 🇺🇸

September 29, 2008

Dear Associate:

Each year Bank of America calculates an annual benefits base rate (ABBR) for associates whose base salary is 10% or less of their total benefits-eligible compensation. ABBR is used to provide coverage equivalent to total benefits-eligible compensation for associate basic life insurance, associate supplemental life insurance, accidental death and dismemberment and long-term disability plans.

ABBR is used to determine leave of absence pay. It also may be used to calculate pension accruals for associates on long-term disability or paid leaves of absence.

Based on the following criteria, Bank of America has calculated an ABBR for you effective January 1, 2009:
- Associate hired before Jan. 1, 2007.
- Associate's annual base salary is less than $50,000.
- As of Dec. 31, 2007, associate's base salary is 10% or less of 2007 total benefits-eligible compensation.

ABBR is the sum of base pay on Dec. 31, 2007, as well as 2007 performance year eligible incentives, Rewarding Success Program payout, EIP (cash and principal), and 2007 draw. ABBR eligibility is not based on job code or position.

Following is an example of a 2009 ABBR calculation for an eligible associate:
- John was hired in 2006
- Base salary on Dec. 31, 2007: $45,000
- 2007 total benefits-eligible compensation: $500,000
- Base salary is 9% of total benefits-eligible compensation, therefore John is eligible for ABBR in plan year 2009
- ABBR for plan year 2009: $500,000

Note: The ABBR calculation above is used to calculate monthly long term disability benefits instead of the average 12-month calculation outlined on page 97 of the *Associate Handbook 2005*. Long-term disability benefits are limited to $30,000 per month before any reduction for other income sources.

You will receive your 2009 annual enrollment materials the week of October 6. Please keep this information with your enrollment materials for future reference.

If you have questions about ABBR, please contact the Personnel Center at 1.800.556.6044. Representatives are available Monday through Friday (excluding certain holidays) between 8:30 a.m. and midnight Eastern. When contacting the Personnel Center, you will need to enter your Customer ID and PIN (the same ones you use to log on to eWorkplace® and NetBenefits®). Once verified, say "Health and Insurance," then say "Representative."

Bank of America Global Human Resources

00-01-0700B  08-2007



BM  00029

# EXHIBIT P

CERTIFIED
COPY

# In The Matter Of:

*WILLIAM MARR*

*v.*

*BANK OF AMERICA*

---

## ANN THOMPSON - Vol. 1
### December 20, 2010

---

**MERRILL CORPORATION**

LegaLink, Ino.

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

ANN THOMPSON - 12/20/2010

```
1        A.    And then it says "Conventional loan fee policy
2    - government."
3        Q.    And your recollection is that Exhibit 7 applies
4    only to government fee policies?
5        A.    I don't have any recollection of this at all.
6    I'm reading the document that says "Government."
7        Q.    And as you read the document, is it your
8    recollection that these policies all apply only to
9    government loans?
10        A.    I don't know.
11        Q.    Now, Exhibit 8, that same sentence says
12    "Pricing flexibility underage will be charged 100
13    percent to CRE pricing strategy." Do you see that?
14        A.    So any underage for, under PFUN, went to
15    pricing strategy, yes.
16        Q.    What is "CRE pricing strategy"?
17        A.    Our pricing group, I believe, at the time.
18        Q.    So in 2008, if PFUN was used, the cost of the
19    PFUN would be borne by the pricing group?
20        A.    No.    There was a calculator, as I said, and the
21    amount that went to PFUN would be charged to PFUN and
22    the amount alloted that the loan officer agreed to take
23    above the line on their compensation as their share
24    would be, would go to the loan officer.
25        Q.    Do you have any understanding of what is meant
```

ANN THOMPSON - 12/20/2010

1    by Exhibit 8 where it says, "Pricing flexibility

2    underage is limited to no more than one point of the

3    loan amount and will be charged 100 percent to CRE

4    pricing strategy"?

5        A.   Right.  So when -- if a loan officer needed to

6    compete on a price and could document a competitive

7    reason to do so and get approval from the manager, there

8    was a calculator that determined how much would be

9    charged to PFUN, meaning the bank, and how much the loan

10   officer would share in that above the line on their

11   compensation.

12           So the piece that the loan officer agreed to

13   take would be charged to -- excuse me, would be taken

14   from -- no.  Strike that.  Would be calculated as part

15   of their ultimate compensation.

16       Q.   Okay.

17       A.   The office would also take a piece, and the

18   rest of it would be charged to PFUN.

19       Q.   Okay.  What is your understanding of Exhibit 8

20   where it says, "Will be charged 100 percent to CRE

21   pricing strategy"?

22       A.   That that amount of the PFUN that the bank was

23   going to pay for in negotiating that price, that piece

24   of it that the bank pays for would be accounted for

25   under that, under CRE pricing strategy; the part that

ANN THOMPSON - 12/20/2010

Page 72

1    the bank paid for.

2        Q.   Okay.   Are you aware of any written policy,

3    ever, in which it sets forth that the loan officer would

4    be allocated a piece of the PFUN?

5        A.   Our region PFUN calculator set forth precisely

6    what the loan officer would pay for out of their

7    above-the line compensation on every single loan,

8    depending on the amount of the PFUN.   And that was

9    determined at the region level.   Yes, I am.

10       Q.   Are you aware of any publication of a pricing

11   flexibility underage retail-only policy prior to October

12   1, 2008?

13       A.   I'm not.

14           MR. BECHT:   Can we have this marked as Exhibit

15   9.

16               (Whereupon, Deposition Exhibit No. 9

17                was marked for identification.)

18           THE WITNESS:   Is there a question?

19           MR. BECHT:   Q.   Have you had a chance to review

20   Exhibit 9?

21       A.   I have.

22       Q.   Have you ever seen Exhibit 9 before?

23       A.   I have.

24       Q.   When did you first see Exhibit 9?

25       A.   On Friday.

CERTIFICATE OF REPORTER

I, KAREN A. FRIEDMAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: _December 29_, 2010

_Karen A. Fr_
_____
KAREN A. FRIEDMAN, CSR 5425

91

# EXHIBIT Q

CERTIFIED
COPY

# In The Matter Of:

*WILLIAM MARR*
*v.*
*BANK OF AMERICA*

---

## *HAROLD MICHAUD – Vol. 1*
### *December 21, 2010*

---

**MERRILL CORPORATION**
LegaLink, Inc.

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

HAROLD MICHAUD - 12/21/2010

1       A. Yes.

2       Q. Okay.  Do you recall whether there was ever a

3   limit on the amount of PFUN that could be used -- well,

4   there was a limit on the amount of PFUN that could be used

5   on a loan, right?  You don't recall what it is, but there

6   was some limit?

7       A. Yes, there were parameters.

8       Q. Do you recall whether your area ever had a

9   different parameter than what was a company-wide

10  parameter?

11          MS. MINER:  Objection.  Calls for speculation and

12  vague and ambiguous.

13          THE WITNESS:  I did not know what other areas of

14  the country were doing.

15  BY MR. SACHS:

16      Q. Was PFUN a nationwide plan or company-wide plan?

17          MS. MINER:  Objection.  Calls for speculation.

18          THE WITNESS:  I don't have the answer to that.

19  BY MR. SACHS:

20      Q. Okay.

21      A. I would assume.

22      Q. Were you ever trained on PFUN?

23          MS. MINER:  Objection.  Vague and ambiguous.

24          THE WITNESS:  You mean officially trained?

25  BY MR. SACHS:

HAROLD MICHAUD - 12/21/2010

1    Q. When you were working with the PFUN, were there

2    mortgage loan officers who didn't participate?

3         MS. MINER:  Objection.  Vague and ambiguous.

4         THE WITNESS:  Not that I'm aware of.

5    BY MR. SACHS:

6    Q. Okay.  Do you know a man by the name of Scott

7    Nicholson?

8    A. No.

9    Q. Okay.  Did mortgage loan officers have the option

10   to not participate?

11   A. Not that I'm aware of.

12   Q. Is there any reason you can think of why one

13   mortgage loan officer would be required to be participate

14   and another one wouldn't be?

15        MS. MINER:  Objection.  Calls for speculation.

16        THE WITNESS:  I mean, if there was a potential, I

17   guess from thinking possibly in a scenario, maybe there

18   was a customer service issue, maybe.  I don't know.

19   BY MR. SACHS:

20   Q. Other than a customer service issue?

21   A. I mean, I could spend an hour thinking about it.

22   Not that I'm aware of in this -- when I did them.  It was

23   very common for loan officers to participate.

24   Q. And you're not aware of any loan officer who

25   didn't have to participate, right?

## CERTIFICATE OF REPORTER

I, ANGELA T. KOTT, Certified Shorthand Reporter, hereby certify that the witness in the forgoing deposition was duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

Dated: January 5, 2011

ANGELA T. KOTT, CSR 7811

# EXHIBIT R

CERTIFIED COPY

# In The Matter Of:

## *WILLIAM MARR*
### *v.*
## *BANK OF AMERICA*

---

## *TYLER RUSSELL - Vol. 1*
### *January 18, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

TYLER RUSSELL - 1/18/2011

Page 25

1       A.    Can you clarify "how to use"?

2       Q.    Sure.   You indicated there were three general

3  topics you discussed with Ann Thompson: the allocation

4  of PFUN within the specific uses, how to use PFUN, and

5  the consequences if it's not used appropriately.

6       A.    Yes.

7       Q.    Within the topic of how to use PFUN, what

8  conversations do you recall with Ann Thompson?

9       A.    Competitive situations.  We should cut back on

10  uses and refinances more for purchase transactions.

11      Q.    When you had these conversations with Ann

12  Thompson, were they one-on-one conversations?

13      A.    One-on-one and group conversations.

14      Q.    Okay.  Do you recall Wayne Perry being present

15  for any of these conversations?

16      A.    Specifically Wayne, I can't recall.

17      Q.    Okay.  Other than PFUN being used for

18  competitive situations and cutting back using and

19  refinancing, and more focusing on purchasing, do you

20  recall anything else that Ann Thompson told you

21  regarding how to use PFUN?

22      A.    Can you repeat that again?

23      Q.    Sure.  You indicated that one of the topics you

24  discussed with Ann Thompson was how to use PFUN, and you

25  indicated what you recall is it should be used for

TYLER RUSSELL - 1/18/2011

Page 26

1    competitive situations, and you've been cutting back on
2    refinancing, and that's the goal.  And that should be
3    used more within purchasing.  Do you recall anything
4    else you discussed?
5        A.   How we would allocate it to the loan officers,
6    which is just how, when we created the PFUN calculator.
7    I should say when we defined the PFUN calculator.
8        Q.   And what was the decision on how to allocate it
9    to loan officers?
10       A.   Based on the region allocation, we would make
11   some decisions on how we would, the loan officer would
12   take what percentage of it.  So the idea was, at higher
13   underage amounts, we would discourage loan officers from
14   taking higher underage by having them absorb more of the
15   costs, rather than lower underages, where they would
16   take less of an underage and more of a PFUN.  I'm not
17   sure if that made sense.
18       Q.   I believe it did.  I assume the calculator
19   changed at various times, right?
20       A.   Yes.
21       Q.   Do you recall when the calculator first came
22   into existence?
23       A.   I don't specifically recall the day.
24       Q.   Was Ann Thompson in that position or was
25   Charles Putris in that position?

TYLER RUSSELL - 1/18/2011

```
 1      Q.    Yes.

 2      A.    I can't recall any other specific.

 3            MR. SACHS:  Do you want to take a break?  It's

 4   been an hour.

 5            MS. RYAN:  Yes.  Just a five-minute break.

 6            (Off the record.)

 7            MR. SACHS:  Back on the record.  We're back

 8   from a break.

 9      Q.    Are you all right to continue?

10      A.    Yes.

11      Q.    You understand you are still under oath?

12      A.    Yes.

13      Q.    All the same admonitions I gave you at the

14   beginning still apply.

15      A.    Yes.

16      Q.    Exhibit 4, if you can get that in front of you

17   again.  Sorry.

18            Is there anywhere in this document that tells

19   MLOs that they're going to have to pay a percentage or a

20   part of a PFUN?

21      A.    An MLO wouldn't pay a portion of PFUN.  Let me

22   clarify.  PFUN is not an MLO portion.  P-F-U-N is

23   specifically secondary marketing CRE pricing out there.

24            So to say "Would a loan officer pay a portion

25   of that," we're talking -- if the question is would a
```

TYLER RUSSELL - 1/18/2011

Page 55

```
 1    loan officer have to pay a portion of underage, that's
 2    different.  But if you're talking would a loan officer
 3    have to pay a portion of PFUN, it doesn't apply.
 4        Q.   How about if I phrase it this way.  Is there
 5    anything in this policy that tells an MLO, is there
 6    anything that indicates to them that they have to share
 7    in a portion of that underage?
 8        A.   Well, it says that it's at the discretion of
 9    the regional exec.
10        Q.   That's the only thing that --
11        A.   That's correct.
12             MR. SACHS:  Exhibit 5.
13                 (Whereupon, Deposition Exhibit No. 5
14                  was marked for identification.)
15             MR. SACHS:  Q.  Can you tell me what Exhibit 5
16     is.
17        A.   It's the pricing flexibility underage policy
18    for retail.
19        Q.   Have you seen this policy in the ordinary
20    course of your employment with Bank of America?
21        A.   Yes.
22        Q.   If you look at that first paragraph in
23    "Overview," again it uses one point of the loan amount.
24    It says it "will be charged 100 percent to CRE pricing
25    strategy."  It's different from the last one, that said
```

TYLER RUSSELL - 1/18/2011

```
 1        Q.   What is the "pricing flexibility underage -
 2   specific operating requirements - retail only"?
 3        A.   That is another policy.  That covers the
 4   operation.
 5        Q.   When you say "covers the operation," what do
 6   you mean by "the operation"?
 7        A.   Usually when we have specific operating
 8   requirements, those apply to the processing group as far
 9   as things that they need to do within the system to
10   ensure it's done right.
11        Q.   What is the processing group's role in regards
12   to PFUN?
13        A.   Making sure that the codes are, how they would
14   input the codes, like into a loan-processing system,
15   things of that nature.
16        Q.   Do they just do that as sort of a rote thing,
17   of, this much goes to PFUN, this one goes to the MLO, or
18   do they make decisions on the allocation?
19        A.   They don't make decisions on the allocation.
20        Q.   They're told what to enter and that's what they
21   enter?
22        A.   That's correct.
23             MR. SACHS:  I hand you Exhibit 6.
24             (Whereupon, Deposition Exhibit No. 6
25                  was marked for identification.)
```

TYLER RUSSELL - 1/18/2011

 1          MR. SACHS:   Q.   Again, just let me know

 2   whenever you are ready.

 3       A.   Okay.

 4       Q.   Can you tell me what Exhibit 6 is?

 5       A.   It's the pricing flexibility underage policy

 6   for retail market.

 7       Q.   Did you receive this in the ordinary course of

 8   your employment of Bank of America?

 9       A.   Yes.

10       Q.   It seems to me it's generally the same, on the

11   first page.

12          On the second page, in that little chart at the

13   top there's the "Parameter" usage and the "Definition,"

14   "Determined by CRE pricing strategy."  What does that

15   mean?

16       A.   The usage is, that refers to the first page

17   where it talks about permissible usage.

18       Q.   So the section that's "Permissible underage" on

19   the first page?

20       A.   Oh, I'm sorry.  Well, that -- the use is

21   determined by CRE pricing strategy -- refers to the

22   philosophy behind the usage of PFUN.  And I believe it's

23   explained in the first part of the overview, but give me

24   a minute and I'll review this.

25          I'm not specifically seeing that.  It is kind

1    of under the "Permissible underage," where it talks

2    about, "Underage is only to be used in order to meet

3    competitive market forces on a loan-by-loan basis."

4         But usage explains, or reference in this is

5    determined by CRE pricing strategy.

6    Q.   What in Exhibit 6 tells the MLO that if they're

7    requesting, got an underage where they're requesting

8    PFUN that they may have to bear part of that underage

9    cost?

10   A.   The mortgage loan officer can apply for pricing

11   flexibility underage, subject to the requirements of the

12   policy and regional executive approval.

13   Q.   Anything else?

14   A.   Under "Program and product availability," it

15   talks about when they can't use it.

16   Q.   Okay.  Anything else?

17   A.   "Rate renegotiations."  It talks about when

18   they can't use it, and it also states, "PFUN should only

19   be applied to those cases in which the applicant has

20   received a better offer from a competitor and should be

21   accompanied by proper documentation."

22   Q.   Is there anything in Exhibit 6 that tells the

23   MLO if they're using underage for competitive reasons,

24   properly, that they may have to share in the amount of

25   that underage?

1          MS. RYAN:  I thought you just asked that

2    question.

3          MR. SACHS:  It's a narrower one.

4          MS. RYAN:  Can you repeat the first question

5    that he asked.

6          (Record read.)

7          THE WITNESS:  And the second question is?

8          (Record read.)

9          MS. RYAN:  I'm not seeing how those questions

10   are different.  Answer it if you understand the

11   question.

12         THE WITNESS:  I'm sorry.  I'm re-reading this

13   document again to state it specifically.

14         It talks about, in this document, that a

15   regional executive will manage the underage code by

16   utilizing the information out there.

17         So, which comes back to the discretion of the

18   regional exec out there.  And if CRE pricing has the

19   ability to discontinue, modify, or curtail the ability

20   to utilize pricing flexibility on a regional basis.

21         So they're responsible for monitoring the

22   overall usage of it.  They had to stay within a certain

23   allocation, the regions did, out there.  So that's why

24   the regions would communicate to the offices what our

25   allocations were.

TYLER RUSSELL - 1/18/2011

Page 62

1          If they didn't, then the numbers would be cut

2     back; their allocation would be cut back.

3          So from a loan officer standpoint, this general

4     policy basically talks about how the program works.

5          The specifics usually were given to them from

6     their sales managers.

7          MR. SACHS:  Q.  So in answer to my question,

8     it's that second paragraph in "Overview," you believe,

9     is the only thing in here that puts the MLO on alert

10    that they might have to bear part of the cost even if

11    they're properly using PFUN for a competitive reason?

12         A.   Yeah, and under "Program and product

13    availability."

14         Q.   What in that talks about properly using it and

15    still having to bear part of the cost?

16         A.   They can only use it on specific types of

17    products out there.

18         Q.   So that would be, an example of not using it

19    properly would be doing it on, say, an Acorn?

20         A.   Correct.

21         Q.   So as far as using it properly, it's only that

22    one paragraph, as far as regional executives?

23         A.   That it's the discretion of the regional exec,

24    yes.

25         Q.   I meant to ask you the same on Exhibit 5.

TYLER RUSSELL - 1/18/2011

1      A.    Uh-huh.

2      Q.    -- my question about where it says if you're

3  using it for a competitive reason, that you might have

4  to end up bearing part of it; right?

5      A.    Yes.

6      Q.    And that's the "Overview" area.  And then you

7  also believe it's somewhere in the "Permissible

8  underage" section?

9      A.    Yes.

10      Q.    And other than this policy, is there any other

11  written policy that says, "You, MLO, may have to bear

12  part of the cost of a PFUN even if you're using it, if

13  you're requesting PFUN for the right reasons"?

14      A.    I have to back up.  If they're using underage

15  -- and I want to clarify from underage and PFUN -- if

16  they're using underage, the underage policy is in their

17  comp plan, and that's the document that they sign and

18  agree to.

19          Pricing flexibility is an optional program,

20  that they don't have to use, and in competitive

21  situations they can use it with -- once again, at the

22  regional executive's discretion, and in those situations

23  we can allow, indicate a portion of the underage to

24  secondary markets, depending on what our allocation is.

25          So it's not our underage policy; it's specific

1    to competitive pricing situations, case by case.

2        Q.   Where is the competitive pricing policy that

3    says you may still have to pay part of the underage,

4    even if you're using PFUN to offset competitive pricing?

5        A.   This policy doesn't cover that specifically.

6    It's covered in the comp, in the loan officer's

7    compensation plan, regarding underage; what our underage

8    policy is.  This is different.  This is an optional

9    program for them.

10       Q.   Right.  Those are the only two places where

11   that would be referenced, is either in the underage comp

12   plan or this PFUN plan?

13       A.   Once again, the regions came out with their own

14   policy.  Each region would create their own policy to,

15   once again, stay within their allocation out there.  So

16   once again, northern California, we used the calculator,

17   whatever it is, where other regions didn't do anything

18   like that.

19            They decided that, A, all decisions had to come

20   to the region.  And they would make a case-by-case

21   situation.  Or they were all given a certain low

22   percentage, like 25 basis points, as an example, and

23   they could have that discretion.

24            Each region kind of created their own policy.

25   As long as they stayed within the allocation, they were

1           was marked for identification.)

2           MR. SACHS:  I will hand you Exhibit 13.

3           THE WITNESS:  Okay.

4           MR. SACHS:  Q.  Have you seen Exhibit 13

5    before?

6      A.   Yes.

7      Q.   Is this the e-mail that you reviewed in

8    preparation for today?

9      A.   Yes.

10     Q.   And primarily, that was the Bill Quinn e-mail

11   that's on the last page of this document?

12     A.   Yes.

13     Q.   This is the, an example of the e-mail you're

14   talking about sending out -- who is Bill Quinn, first of

15   all?

16     A.   Bill Quinn at that time was the area sales

17   manager.

18     Q.   Okay.  Where is he in relation to, I guess at

19   that time it was Charles Putris?

20     A.   He was like a junior regional.

21     Q.   In this e-mail, is Mr. Quinn informing the

22   sales managers of new PFUN guidelines?

23     A.   Yes.

24     Q.   Other than this e-mail, are you aware of any

25   other e-mails containing any change to the PFUN

TYLER RUSSELL - 1/18/2011

1    guidelines for the northern California region?

2         A.   Specific e-mails, no.

3         Q.   And in this e-mail, what's happening, the new

4    situation would be, for purchase transactions, the first

5    .25 underage was split between the AE and the sales

6    office, right?

7         A.   Yes.

8         Q.   And the next .75 is allocated towards PFUN?

9         A.   Yes.

10        Q.   And after that, the next .25 is split between

11   the AE and the sales office?

12        A.   Yes.

13        Q.   And the next .25 is allocated towards PFUN;

14   right?

15        A.   Yes.

16        Q.   If there were a purchase that had 1.25, the AE

17   would end up paying 1.25 of that total underage, right?

18   One-half of .25?

19        A.   On a purchase transaction, yes.

20        Q.   And the sales office would pay the other .25?

21        A.   Yes.

22        Q.   And for refinance, the policy would be the AE

23   and the sales office split the first .25, right?

24        A.   Yes.

25        Q.   And then the next .25 is allocated towards

1    PFUN?

2        A.   Yes.

3        Q.   So if there were .75 underage and PFUN were

4    able to be used, 1.25 would be borne by the AE, right?

5        A.   Yes.

6        Q.   And the same amount by the sales office?

7        A.   Yes.  Can I make one clarification?

8        Q.   Yes.

9        A.   Well, no.  I take it back.  I was just reading

10   the last paragraph; that seemed to explain a little bit

11   more regarding the purchase guidelines.  But it showed

12   some variation that we would allow in certain

13   circumstances.

14       Q.   Okay.  When there were changes to the CRE

15   policy and product guide, how were MLOs alerted to

16   changes?

17       A.   You know, I don't recall specifics over the

18   past five years.  We have had it in various formats.

19   Before, where we would get like an e-mail notification;

20   sometimes we have something called Tuesday News that

21   would give policy updates, situations like that, that

22   loan officers would review.

23            Sometimes managers would get a heads-up through

24   their notifications.

25            There were various formats that kind of changed

CERTIFICATE OF REPORTER

I, KAREN A. FRIEDMAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was requested.  Any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:  _January 24_____, 2011

_____
KAREN A. FRIEDMAN, CSR 5425

# EXHIBIT S

# In The Matter Of:

*WILLIAM MARR*
*v.*
*BANK OF AMERICA*

---

## *H. WAYNE PERRY - Vol. 1*
### *January 14, 2011*

---

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

| | | |
|---|---|---|
| 1 | underage policy breakdown would be on the allocation | 16:33:09 |
| 2 | worksheet? | 16:33:12 |
| 3 | So let me -- for an example, you know, there's | 16:33:14 |
| 4 | the .75 total, .55 is the PFUN, .1375 to the MLO, .0625 | 16:33:16 |
| 5 | to sales.  If PFUN was usable, would there ever be an | 16:33:22 |
| 6 | occasion where the MLO would pay a higher rate or a | 16:33:30 |
| 7 | higher amount than .1375? | 16:33:34 |
| 8 | MS. MINER:  Objection, calls for speculation. | 16:33:40 |
| 9 | THE WITNESS:  In theory, it -- it would be | 16:33:42 |
| 10 | possible, yes.  In practical application, I don't know | 16:33:43 |
| 11 | that it occurred. | 16:33:47 |
| 12 | MR. SACHS:  Q.  Okay.  You can't think of any | 16:33:48 |
| 13 | reason that that would happen? | 16:33:50 |
| 14 | A.  Well, again, if utilization was -- was way off | 16:33:51 |
| 15 | the charts or way out of wack with the -- with the | 16:33:55 |
| 16 | targeted utilization, it -- it could happen, yes. | 16:33:58 |
| 17 | Q.  Okay.  But you don't recall that happening? | 16:34:00 |
| 18 | A.  Not any specific times, no. | 16:34:02 |
| 19 | Q.  Okay.  All right.  Exhibit 36. | 16:34:04 |
| 20 | (Whereupon, Plaintiff's Exhibit 36 was marked | 16:34:09 |
| 21 | for identification.) | 16:34:10 |
| 22 | THE WITNESS:  Okay. | 16:34:47 |
| 23 | MR. SACHS:  Q.  Have you had a chance to | 16:34:48 |
| 24 | review this exhibit? | 16:34:49 |
| 25 | A.  Yes. | 16:34:50 |

PERRY, H. WAYNE   - 1/14/2011

Page 270

| | | |
|---|---|---|
| 17:19:42 | 1 | delegated it to Shakoon? |
| 17:19:44 | 2 | A.   Yeah.   There was enough capability within the |
| 17:19:47 | 3 | corporate accounting rules where I could delegate her as |
| 17:19:50 | 4 | my proxy for a timecard approval. |
| 17:19:54 | 5 | Q.   Sure. |
| 17:19:56 | 6 | A.   Yeah. |
| 17:19:57 | 7 | Q.   All right.   I think I asked you this, but you |
| 17:20:01 | 8 | don't know what Kristen was paid out of Bill's |
| 17:20:04 | 9 | commission, right? |
| 17:20:05 | 10 | A.   No. |
| 17:20:05 | 11 | Q.   And that's true for whatever time period when |
| 17:20:07 | 12 | she started in 2007, 2008 right? |
| 17:20:10 | 13 | A.   Correct. |
| 17:20:10 | 14 | Q.   Okay. |
| 17:20:11 | 15 | Mark this 44. |
| 17:20:21 | 16 | (Whereupon, Plaintiff's Exhibit 44 was marked |
| 17:20:21 | 17 | for identification.) |
| 17:20:49 | 18 | THE WITNESS:   Okay. |
| 17:20:49 | 19 | MR. SACHS:   Q.   Did you receive Exhibit 44 in |
| 17:20:51 | 20 | the ordinary course -- course of your employment with |
| 17:20:53 | 21 | Bank of America? |
| 17:20:55 | 22 | A.   I believe so, but it's a very unusual e-mail |
| 17:20:57 | 23 | address.   But I would -- I would assume so, yes. |
| 17:21:01 | 24 | Q.   Okay.   And you're talking about Bill's e-mail |
| 17:21:03 | 25 | address, not your e-mail address, since yours doesn't |

H. WAYNE PERRY - 1/14/2011

| | | |
|---|---|---|
| 1 | show up, right? | 17:21:06 |
| 2 | A.   Yes. | 17:21:07 |
| 3 | Q.   Okay.  Bill's writing to you and he requests | 17:21:08 |
| 4 | an additional full-time AEA so that he can increase his | 17:21:10 |
| 5 | production, right? | 17:21:17 |
| 6 | A.   Correct. | 17:21:18 |
| 7 | Q.   Did you agree that he would benefit from an | 17:21:19 |
| 8 | AEA? | 17:21:23 |
| 9 | MS. MINER:  Objection, vague and ambiguous, | 17:21:24 |
| 10 | calls for opinion. | 17:21:24 |
| 11 | THE WITNESS:  He wanted one, so I supported | 17:21:26 |
| 12 | him in the request, yes. | 17:21:28 |
| 13 | MR. SACHS:  Q.  Well, did you believe that it | 17:21:30 |
| 14 | would benefit him to have another one? | 17:21:32 |
| 15 | A.   I'm not real sure that I did. | 17:21:38 |
| 16 | Q.   Okay.  Did you believe that it would benefit | 17:21:40 |
| 17 | Bank of America to have Bill have another AEA? | 17:21:42 |
| 18 | MS. MINER:  Objection -- | 17:21:47 |
| 19 | THE WITNESS:  I don't -- | 17:21:47 |
| 20 | MS. MINER:  Sorry. | 17:21:47 |
| 21 | -- vague and ambiguous. | 17:21:47 |
| 22 | THE WITNESS:  Even less sure that I did. | 17:21:49 |
| 23 | MR. SACHS:  Q.  Okay.  Why did you not believe | 17:21:52 |
| 24 | -- or why do you think you didn't believe that it would | 17:21:53 |
| 25 | benefit Bank of America for Bill to have a second | 17:21:55 |

PERRY, H. WAYNE  - 1/14/2011

Page 303

1              CERTIFICATE OF REPORTER

2         I, KELLY A. RHOADES, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth and nothing but the truth in the

6    within-entitled cause;

7              That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time and

9    place therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12             That before completion of the deposition,

13   review of the transcript [X] was [] was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17             I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties hereto.

22             DATED:  January 26, 2011

23             _____

24             KELLY A. RHOADES
               CSR 7965

25

# EXHIBIT T

## WLSF

| | |
|---|---|
| **From:** | Marr, Bill [IMCEAEX-_O=BANK+20OF+20AMERICA_OU=NORTH+20AMERICAN+20ADMINISTRATIVE+20GROUP_( |
| **Sent:** | Thursday, July 19, 2007 12:12 PM |
| **To:** | Perry, Herbert W; Wadhwani, Shakoon |
| **Subject:** | Additional AEA Request!!! |
| **Importance:** | High |

Wayne,

I am requesting an additional full-time AEA so that I can increase my production. YTD I have funded $43.5 million which includes all of my 1XClose that has rolled so far from last year along with new funded 1XClose this year. I should fund 12 million this month and I am starting to become overwhelmed with work, calls and marketing etc... I am certain that I could increase my production by 20% - 30% which would mean more money and production for everyone. I am willing to pay them directly out of my own commissions but I need them to be a bank employee so that there are no restrictions as it relates to customer sensitive information.

Please elevate my request to Ann as I am hopeful she will support my request with where I am at volume wise YTD... Kristen Hampton and I believe that there is enough space in our current location to accommodate 1 more person. I also have several leads on candidates for the position but do realize that we will need to post the position and then interview all qualified candidates and move forward from there. Please let me know what if anything you will need from me to facilitate or help expedite my request.

Thanks,

**Bill Marr**
**Vice President**
**Retail Mortgage Lending**
**Direct:  916-861-9230**
**Cell:    916-240-3400**
**Fax:    916-405-3900**
bill.marr@bankofamerica.com

Assistant:
**Kristen Hampton**
**Retail Mortgage Lending**
**Direct:  916-861-9243**
Kristen.hampton@bankofamerica.com

CONFIDENTIALITY NOTICE: This transmittal is a confidential communication or may otherwise be privileged. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error and that any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this communication in error, please notify this office, and immediately delete this message and all its attachments, if any.

# EXHIBIT U

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

WILLIAM MARR,                        )
                                     )
            Plaintiff,               )
                                     )
      vs.                            ) No. CV 09-05978-WHA
                                     )
BANK OF AMERICA, NATIONAL            )
ASSOCIATION and DOES 1 through       )
100, inclusive,                      )
                                     )
            Defendants.              )
                                     )
_____    )

CERTIFIED
COPY

DEPOSITION OF

MICHAEL JOSEPH

December 15, 2010

REPORTED BY:  KAREN A. FRIEDMAN, CSR 5425    JOB # 432458

```
 1    specific policies in the plan documents or -- strike

 2    that.

 3           Is there one plan document, or are there

 4    multiple documents that are reviewed?

 5           MS. MINER:  Objection, calls for speculation,

 6    vague and ambiguous.

 7           THE WITNESS:  To my knowledge, there is a

 8    long-term disability plan document.  In addition, there

 9    is the associate handbook to be reviewed.

10           MS. SIVARAJAH:  Let's see if we can get an

11    understanding.  I'll introduce this document, entitled,

12    "Bank of America Group Benefits Program," as Exhibit 1.

13           (Whereupon, Deposition Exhibit No. 1

14               was marked for identification.)

15           MS. SIVARAJAH:  Go ahead and take your time

16    reviewing it and then let me know.

17           THE WITNESS:  Okay.

18           MS. SIVARAJAH:  Q.  Have you had a chance to

19    review the Bank of America Group Benefits Program?

20      A.   Yes.

21      Q.   Have you seen this document before?

22      A.   I have.

23      Q.   Okay.  And when have you seen it?

24      A.   I don't recall.

25      Q.   Is this one of the documents that you were
```

MICHAEL JOSEPH - 12/15/2010

Page 38

1    referring to when you said "plan documents" earlier in

2    your testimony?

3        A.   It is not.

4        Q.   Who authors the Bank of America Group Benefits

5    Program?

6        A.   I don't know.

7        Q.   Do you know if it's Bank of America?

8        A.   I don't.

9        Q.   Do you know how you obtained this document

10   before?

11       A.   No, I don't.

12       Q.   Do you know if you received it in your capacity

13   as an employee of Bank of America?

14       A.   I did not.  I received it in the capacity of my

15   job.

16       Q.   Do you know if employees receive this group

17   benefits program document?

18       A.   I don't, other than if they request it.

19       Q.   Do you know who -- I asked you if you knew who

20   authored it, but do you know of any individuals who work

21   with this document?

22            MS. MINER:  Objection, vague and ambiguous.

23   Calls for speculation.

24            THE WITNESS:  I believe our attorneys.  That

25   would be all I know.

1          MS. SIVARAJAH:   Q.   Aside from attorneys, do

2     you know any other individuals who work with this

3     document?

4          A.   In terms of "work with," I don't.  I believe if

5     it's requested from the bank, we have an individual who

6     is responsible for sending out documents.

7          Q.   Is that individual one of your subordinates?

8          A.   They are not.

9          Q.   Who is this person?

10         A.   Her name is Freda White.

11         Q.   And what is her job function?

12         A.   She manages the appeals process within the

13    bank, as well as document requests.  And I'll clarify

14    that and say ERISA appeals.

15         Q.   Have you ever reviewed this document with any

16    employee?

17              MS. MINER:   Objection, vague and ambiguous.

18              THE WITNESS:   Not that I recall.

19              MS. SIVARAJAH:   Q.   Do you remember how long

20    ago you saw this document before today?

21         A.   I don't.

22         Q.   Okay.  It's definitely not something that you

23    go to for, as part of your job functions.   Correct?

24         A.   That's correct.

25              MS. SIVARAJAH:   Can you mark this as Exhibit 2.

MICHAEL JOSEPH - 12/15/2010

Page 43

1    whether the ABBR should be part of this employee benefit

2    plan?

3              MS. MINER:   Objection, assumes facts not in

4    evidence.

5              THE WITNESS:   I don't know anything that would

6    have changed the MetLife plan.   I do believe they made a

7    change to the Aetna.   Or, I don't know if it was a

8    change.   It may have already been incorporated.   But I

9    do believe it's reflected in the Aetna plan.

10             MS. SIVARAJAH:   Q.   Before we get ahead of

11   ourselves, can you tell me what ABBR is?

12        A.   Annual benefit base rate.

13        Q.   And what is the purpose of the ABBR?

14        A.   The purpose of ABBR is to provide a benefit

15   amount to commissioned associates for purposes of some

16   of their benefits.

17        Q.   Now, is this amount that's calculated as ABBR,

18   is it the same for long-term disability benefits as well

19   as any other benefits?

20        A.   It is.

21        Q.   Okay.   Are you aware of policies or guidelines

22   on how the ABBR is calculated?

23        A.   I am not.

24        Q.   The ABBR is only used for commissioned

25   employees, is that correct?

1        A.    I don't believe so.

2        Q.    Do you know if Richard Deal is the only one who

3    calculates ABBR for Bank of America?

4        A.    To my knowledge, he is.  Although, again, he

5    could use some vendor, or something, too.

6        Q.    Other than long-term disability benefits, what

7    other benefits entail the calculation of ABBR?

8        A.    For clarification, other benefits that would

9    utilize ABBR upon their execution would be life

10    insurance, and I think AD&D as well; accidental death

11    and dismemberment insurance.  I'm not positive on that.

12        Q.    What about short-term disability?

13        A.    Yes, it would.

14        Q.    Any other benefits that use ABBR?

15        A.    I don't think so.  But again, there could be.

16        Q.    So when the ABBR is required to be calculated,

17    Richard Deal would provide the number.  Is that correct?

18        A.    That's correct.

19            MS. MINER:  Objection, vague and ambiguous.

20    Provide to who?

21            MS. SIVARAJAH:  That's a good question, a good

22    objection.

23        Q.    When the ABBR requires to be calculated as part

24    of providing benefits, Richard Deal would be the

25    individual who makes the calculation of the ABBR.

```
 1        A.    I don't.

 2        Q.    -- regarding it?  If you go down to the second

 3   column --

 4        A.    Yes.

 5        Q.    -- on the top, there are three different

 6   methods of monthly long-term disability benefits.  Do

 7   you see that?

 8        A.    Yes, I do.

 9        Q.    Okay.  Do you know if employees elect which of

10   the three methods of long-term disability benefits they

11   would like to be paid under?

12        A.    Do employees elect one of the 50, 60, or 60

13   percent?  Yes, they do.

14        Q.    Okay.  Do you know at what point they elect the

15   manner in which they would be paid?

16        A.    What do you mean, "the manner"?

17        Q.    Pursuant to this paragraph.  So when do they

18   choose one of the three?

19        A.    Number one, I believe they receive 50 percent

20   by default.  They would have the opportunity to choose

21   the other two options at annual enrollment or if they

22   have a qualified life event.

23        Q.    For the third option it states, "60 percent of

24   the sum of your monthly pay and 1/12th of your eligible

25   bonus amount."  Do you see that?
```

MICHAEL JOSEPH - 12/15/2010

Page 51

1     A.   Yes, I do.

2     Q.   Do you understand, when it says, "60 percent of

3     the sum," to mean that it is the sum of just your

4     monthly pay plus 1/12th of the eligible bonus amount?

5     A.   I do.

6     Q.   Just so, if I asked that correctly, so do you

7     understand that the bonus amount and the monthly pay are

8     included, and then the 60 percent is taken from that

9     sum?  Or if 60 percent is taken from the sum of the

10    monthly pay and then the bonus is added to that?

11         MS. MINER:  Objection; compound.  But you can

12    answer if you understand.

13         THE WITNESS:  I don't understand.

14         MS. SIVARAJAH:  Q.  Okay.  So this lists that

15    60 percent of the sum of your monthly pay and 1/12th of

16    your eligible bonus amount.  So do you understand that

17    this means that 60 percent of the total of the monthly

18    pay plus 1/12th of the eligible bonus amount?

19    A.   Yes, I understand.

20         MS. MINER:  I think we have to clarify it

21    further, if that's okay.

22         MS. SIVARAJAH:  Okay.

23         MS. MINER:  Do you mind if I try?

24         MS. SIVARAJAH:  Go ahead.

25         MS. MINER:  I think the question, and Mythily,

MICHAEL JOSEPH - 12/15/2010

Page 53

1    Mr. Joseph is going to clarify.

2              MS. SIVARAJAH:  Okay.

3              THE WITNESS:  There was a question you asked me

4    about, if we utilize plan documents for my job function,

5    and I think I said no.  But we do use plan documents in

6    resolving escalations.  Not something that would be in

7    our --

8              MS. SIVARAJAH:  Q.  Any of the exhibits that we

9    covered are those plan documents that you would use?

10       A.    Specifically the handbook, yes.

11       Q.    The handbook, which is Exhibit 4?

12       A.    On occasion the long-term disability plan.

13       Q.    Exhibit 2.

14       A.    Correct.  I think so.  Yes.

15       Q.    Do you review Exhibit 1, the Bank of America

16   Group Benefits Program?

17       A.    I have reviewed it, not for purposes of

18   escalation.

19       Q.    So it's Exhibit 2 and Exhibit 4?

20       A.    Correct.

21       Q.    On another note -- we'll do that later.

22              So right before the break -- before we move to

23   Exhibit 5, if you can go to Exhibit 4, the Associate

24   Handbook, and to page D00639.  It's towards the very

25   end, and page 190 of the actual handbook.

Page 54

1        A.    Okay.

2        Q.    Let me know if you have had a chance to review

3    this page.

4        A.    Okay.

5        Q.    Having reviewed page 190 of the associate

6    handbook, in the left-hand column, third paragraph, it

7    states, "The plan administrator of the plan is the Bank

8    of America Corporation corporate benefits committee."

9    Do you see that?

10       A.    I do.

11       Q.    Do you agree that Bank of America is the plan

12   administrator for the group benefits program which

13   consists of long-term disability benefits?

14            MS. MINER:  Objection, sorry.  Vague and

15   ambiguous as to "Bank of America."

16            THE WITNESS:  Yes, I do agree.

17            MS. SIVARAJAH:  Q.  Okay.  I'm not trying to

18   trip you up or anything; I'm just trying to gain an

19   understanding.  You testified earlier that you believed

20   Fidelity was the administrator of the long-term

21   disability plans.  Do you recall that testimony?

22       A.    I do.

23       Q.    Okay.  Does this change your testimony that

24   it's the Bank of America corporation corporate benefits

25   committee that's the plan administrator?

1      A.   I don't know if it changes it.  I believe it's

2   a semantics issue.  I believe Fidelity administers

3   long-term disability in terms of the mechanics of the

4   program.  Administrative, they're the system of record,

5   and so forth.

6           I do believe the Bank of America corporate

7   benefits committee does have oversight over that.

8      Q.   Okay.  Would it be accurate to say that

9   Fidelity performs the day-to-day or logistical functions

10  of long-term disability?

11     A.   I think that's right to say.

12     Q.   We go to Exhibit 5.  Let me know if you have

13  had a chance to review it.

14          MS. MINER:  He hadn't.  Take your time.

15          THE WITNESS:  Okay.

16          MS. SIVARAJAH:  Q.  Do you recall receiving

17  this e-mail, or these strings of e-mails, which also

18  includes an e-mail from you, in the course of your

19  employment at Bank of America?

20     A.   I don't recall specifically.  I see that I sent

21  it.

22     Q.   Do you have any reason to believe that you

23  didn't send it?

24     A.   No.

25     Q.   Do you remember if this is the first time that

1   for them?

2      A.   I do not.  I read that it was a mistake.

3      Q.   Does this chain of e-mails refresh your

4   recollection that Mr. Marr's long-term disability

5   benefits started January 23rd, 2009?

6      A.   It does.

7      Q.   Do you recall the first time you communicated

8   with Mr. Marr?

9      A.   Do not.

10     Q.   Do you recall if it was before January 22nd?

11     A.   I don't know.

12        MS. SIVARAJAH:  Okay.  Exhibit 7.

13          (Whereupon, Deposition Exhibit No. 7

14            was marked for identification.)

15        MS. SIVARAJAH:  Q.  Did you receive and send

16   the -- actually, it's just you sending.

17        Did you send the e-mail communications in

18   Exhibit 7 in the ordinary course of your employment at

19   Bank of America?

20     A.   Yes.

21     Q.   And the first e-mail is set forth on the first

22   page, and then it goes over to the second page.  It

23   looks like it's not part of the e-mail, which starts at,

24   with Mr. Marr's name.  Do you see that, where I'm

25   pointing?

1          MS. MINER:  Objection; vague and ambiguous.  I

2   don't understand what part of the e-mail you're

3   referring to.

4          MS. SIVARAJAH:  Q.  I'm referring to the bottom

5   of page 1, that goes over to page 2, starting with "Bill

6   L. Marr SSN."

7          MS. MINER:  So what's the question?

8          MS. SIVARAJAH:  I wanted to point him to that.

9          MS. MINER:  Oh, okay.

10         MS. SIVARAJAH:  Q.  Is this captured from some

11  program or something else that you copied and pasted

12  into the e-mails?

13      A.  It is.

14      Q.  Where did you get it from?

15      A.  I pulled it from a system we use called "plan

16  sponsor workstation," or PSW.

17      Q.  And what does plan sponsor workstation, what do

18  you use plan sponsor workstation for?

19      A.  We use plan sponsor workstation to research

20  specific benefit elections applicable to individual

21  associates.

22      Q.  And in this case, with respect to Mr. Marr, why

23  did you copy and paste this particular page from the PSW

24  system?

25      A.  It looks like I was asking them to compare the

1   benefit base rate depicted on the screen with what

2   MetLife was paying to Mr. Marr.

3       Q.   Okay.  And the benefit base rate, according to

4   the screen, is set forth on the second page as

5   $416,130.22.  Correct?

6       A.   That's correct, but on the prior page, the

7   first page, it's as of 1/29/2009.

8       Q.   Right.  So when you captured it on the, it

9   looks like the e-mail is also on January 29, 2009, the

10  benefit base rate is the amount that's set forth on page

11  2.

12      A.   That's correct.

13      Q.   Okay.  On the e-mail that precedes this PSW

14  screen capture, you state, "The method of payment for

15  the long-term disability benefits."  Do you see that?

16      A.   I'm sorry.  Would you repeat that?

17      Q.   Yes.  On the second e-mail, that starts out

18  with, "He just moved from STD to LTD" --

19      A.   Okay.

20      Q.   -- do you see that you state, "He pays for 60

21  percent annual pay plus bonus LTD"?

22      A.   I see that.

23      Q.   That's your interpretation of how the LTD

24  payments should be paid to Mr. Marr.

25              MS. MINER:  Objection.

```
 1    January 29, 2009?

 2         A.    Not that I recall.

 3              MS. SIVARAJAH:   Exhibit 8.

 4              (Whereupon, Deposition Exhibit No. 8

 5              was marked for identification.)

 6         THE WITNESS:   This seems like a continuation of

 7    No. 7.

 8         MS. SIVARAJAH:   Q.   Okay.   Is Exhibit 8 a

 9    series of e-mails that you received and sent in the

10    course of your employment at Bank of America?

11         A.    Yes.

12         Q.    Okay.   And this appears to be a response from

13    Mr. Richard Deal to your prior e-mail, which was set

14    forth in Exhibit 7.   Here there's a reference to FDOA,

15    on the second line.   Do you know what that is?

16         A.    I believe it's first date of absence.

17         Q.    And does this e-mail now refresh your

18    recollection of how the ABBR should be calculated?

19         MS. MINER:   Objection; vague and ambiguous.

20         THE WITNESS:   It doesn't change anything about

21    how it should be calculated, because I don't support

22    that.   So, no.

23         MS. SIVARAJAH:   Q.   So in response to your

24    question about whether, about getting the specifics for

25    the ABBR, Mr. Deal is providing a response here.
```

1    Correct?

2        A.    Yes.

3      Q.    Okay.  Did you subsequently talk to him or

4    anyone else about the content of Mr. Deal's response to

5    you?

6        A.    I don't recall talking about this.  At least

7    not at this point.  We discussed it further --

8        Q.    Right.  I'm just staying within the time frame,

9    now, right after this e-mail.  Do you remember that you

10   learned -- strike that.

11            Do you remember learning that MetLife actually

12   figures out the payout for the long-term disability

13   benefits?

14            MS. MINER:  Objection, assumes facts not in

15   evidence.

16            THE WITNESS:  It was communicated to me, yes.

17            MS. SIVARAJAH:  Q.  And did you agree with

18   that?

19        A.    I don't recall.  I don't believe I would have a

20   reason to disagree.

21        Q.    And in this e-mail, Mr. Deal tells you that the

22   long-term disability payment is based on the 2008 ABBR

23   and not the 2009.  Do you see that?

24        A.    Yes, I do.

25        Q.    And do you understand why the disability

Page 67

1    payment is based on the 2008 ABBR?

2         A.   Yes, I do.

3         Q.   And why is that?

4         A.   The payout for our plan documents are based on

5    pre-disability earnings, and the disability occurred in

6    2008.

7         Q.   Any other reasons why LTD payment is based on

8    the 2008 ABBR rather than 2009?

9         A.   No.  Just covered by the plan.

10        Q.   Do you remember looking at the plan when you

11   were alerted that the manner in which ABBR should be

12   applied is contained in the plan?

13        A.   At this point I don't believe I did.

14             MS. SIVARAJAH:  We go to Exhibit 9.

15             (Whereupon, Deposition Exhibit No. 9

16             was marked for identification.)

17             MS. SIVARAJAH:  Q.  Have you had a chance to

18   review Exhibit 9?

19        A.   I have.

20        Q.   Did you receive Exhibit 9 in the ordinary

21   course of your employment at Bank of America?

22        A.   Yes, I did.

23        Q.   And the second page consists of a spreadsheet

24   that looks like it's attached to the first page of

25   Exhibit 9.  Do you agree?

```
1        A.    I agree.

2        Q.    Okay.  If you look at the spreadsheet, on the

3   column where the numbers are, where it states "Dollar

4   amount," it listed certain amounts for February 6th

5   through August 8th.

6              Do you know where the numbers are coming from?

7              MS. MINER:  Can we just clarify?  You're saying

8   February 6, do you mean February 2006?

9              MS. SIVARAJAH:  Yes.

10             MS. MINER:  And then August 2008?

11             MS. SIVARAJAH:  Yes.

12             MS. MINER:  I may have interrupted you.  Can

13   you read back the question?

14             MS. SIVARAJAH:  Q.  Do you know where the

15   numbers are coming from that's set forth on the seventh

16   column from the left?

17       A.    I do not know where they were pulled from.

18       Q.    Did you ever request to see where the numbers

19   came from?

20       A.    I did not.

21       Q.    Did you ever find out where it came from?

22       A.    I don't know.  Let me clarify that.  I don't

23   know where they came from.

24       Q.    Did you ever ask Mr. Deal where it came from?

25       A.    I have not.
```

1        Q.    And then on the second-to-last column, it

2    states "Draw."  Do you know where that, those numbers

3    are coming from?

4        A.    I do not.

5        Q.    And you didn't ask Mr. Deal where they came

6    from, correct?

7        A.    I did not.

8        Q.    Do you recall any conversations with anyone,

9    after receiving this e-mail with the spreadsheet,

10    concerning Mr. Marr's ABBR?

11        A.    I recall questions at some point in this time

12    frame.  There was a dispute as to whether or not we

13    should be using the 2008 ABBR or the 12-month rolling

14    calculation as defined in the handbook.

15        Q.    And do you remember what the conclusion was?

16        A.    The conclusion; just, at the time, we discussed

17    whether or not we should use ABBR or the 12-month

18    rolling figure.  I don't know how many discussions it

19    was, but it resulted in us recommending the 12-month

20    rolling figure be used.

21        Q.    And when you say "us," you mean Bank of America

22    recommending the 12-month?

23        A.    I mean me and the people I consulted.

24        Q.    Okay.  And what was your basis for recommending

25    the 12-month rolling period as the method of calculating

1    long-term disability payments?

2        A.   My recollection is, when, in talking with Bill,

3    he did not receive -- he says he did not receive the two

4    thousand-- -- let me get my dates right.  The ABBR

5    letter, that would apply to 2008.  So that would have

6    been sent in 2007.

7            We gave him the benefit of the doubt.  He was

8    disputing not receiving the letter.  He was citing the

9    handbook as the way we should be calculating an LTD rate

10   for him.  So giving him the benefit of the doubt, we

11   gave him that 12-month rolling calculation.

12       Q.   When Mr. Marr told you that he had not received

13   this letter, did you or anyone at Bank of America

14   investigate to see whether a letter was sent to him?

15           MS. MINER:  Objection; vague and ambiguous.

16   We're talking about the 2007 letter --

17           MS. SIVARAJAH:  Yes.

18           MS. MINER:  -- regarding the 2008 ABBR

19   calculation, correct?

20           MS. SIVARAJAH:  Yes.

21           THE WITNESS:  I don't remember if we looked

22   specifically into having sent that to him.

23           MS. SIVARAJAH:  Q.  Okay.  Do you remember any

24   communications with MetLife in determining that it

25   should be the 12-month rolling calculation?

1    Clymer.   Just wanted to clarify for the record what

2    exhibit we were looking at.

3         THE WITNESS:   Yes.   But they were not related

4    to ABBR.   They were leave dates.   So I do not recall

5    discussions with them on ABBR.

6         MS. SIVARAJAH:   Q.   In terms of your

7    communications with others within Bank of America, who

8    do you remember talking to, aside from Richard Deal and

9    Dineen Allen, regarding whether to go with the 12-month

10   rolling or the 2008 ABBR?

11        A.   I spoke with Laura Todd as well.

12        Q.   Were you all in agreement that it should be the

13   12-month ruling that should govern the long-term

14   disability payments?

15        A.   I don't know if "agreement" is the right word.

16   But we did go to service delivery, who would be Dineen

17   Allen, for guidance, and that was the guidance we

18   received.

19        Q.   What did she tell you about, what guidance did

20   she provide you?

21        A.   The guidance she provided was in light of him

22   stating he did not receive a letter that we would use

23   the calculations in the handbook.

24        Q.   Do you know who sent the letter?

25        MS. MINER:   Objection; again, vague and

1    ambiguous as to "the letter."  We're talking about the

2    ABBR letter?

3              MS. SIVARAJAH:  Right.

4              THE WITNESS:  The service delivery group and

5    Bank of America sends the letter.  I don't know who

6    physically sends it, but they produce it.

7              MS. SIVARAJAH:  Q.  Do you know if service

8    delivery maintains a list of the individuals that it

9    sends the letters to?

10         A.    I think they do.

11         Q.    As you testified earlier, you don't know if

12   anyone looked into whether the letter was sent to

13   Mr. Marr or not.  Right?

14         A.    I don't recall looking at it.

15         Q.    Do you know if anyone else looked into whether

16   the letter was sent to him or not?

17         A.    I do not.

18         Q.    Do you recall any other communications with

19   anyone at this point regarding the spreadsheet that's

20   attached to page 2 of Exhibit 9?

21         A.    I do not.  I believe I did send it to Mr. Marr.

22         Q.    So you sent it to Mr. Marr after receiving it

23   from Mr. Deal?

24         A.    Yes.

25         Q.    Do you remember the content or substance of the

MICHAEL JOSEPH – 12/15/2010

1           THE WITNESS:  In the first e-mail on the top of

2     the first page, there's a sentence, "Associate has 100

3     percent commissions going on 60 percent LTD and bonus."

4     I'm merely clarifying that the 60 percent paying bonus

5     is LTD.

6           MS. SIVARAJAH:  Let's now mark this one as

7     Exhibit 11.

8                 (Whereupon, Deposition Exhibit No. 11

9                 was re-marked for identification.)

10          MS. SIVARAJAH:  Q.  Have you had a chance to

11    review Exhibit 11, which is Bates-labeled D002275.

12        A.   Yes, I did.

13        Q.   And this is an e-mail that you received in the

14    ordinary course of your employment with Bank of America?

15        A.   That's correct.

16        Q.   And in this, Laura Todd is conveying to you

17    about, conveying information to you about changing

18    Mr. Marr's long-term disability pay.  Correct?

19        A.   That is correct.

20        Q.   Okay.

21        A.   She's conveying it to Andrea Clymer, and I'm

22    copied on it.

23        Q.   And Andrea Clymer is the MetLife liaison for

24    Bank of America?

25        A.   Point of contact, yes.

1      Q.   Point of contact.   So the $351,000 ABBR is, as

2   you've testified earlier, the ABBR based on the 12-month

3   rolling method.   Correct?

4      A.   That's correct.   But a bit of clarification.   I

5   wouldn't classify it as an ABBR.   The ABBR is a

6   calculation to calculate a rate for commissioned

7   associates.   The three fifty-one reflects the rolling

8   12-month calculation as defined in the handbook.

9      Q.   And this is essentially the decision that you

10  already testified to that Bank of America had reached

11  about using the rolling method for Mr. Marr's long-term

12  disability payments.   Correct?

13     A.   Yes.

14     Q.   Do you know why MetLife was not included in

15  determining the method of calculating Mr. Marr's

16  long-term disability pay?

17          MS. MINER:   Objection, calls for speculation.

18          THE WITNESS:   I don't know why.

19          MS. SIVARAJAH:   Okay.   Next is Exhibit 12.

20          (Whereupon, Deposition Exhibit No. 12

21            was marked for identification.)

22          MS. SIVARAJAH:   Q.   Is Luann DeFrancesca just

23  an individual who is filling in for Andrea Clymer?

24     A.   That's what it appears.   I'm not familiar with

25  the name.

MICHAEL JOSEPH - 12/15/2010

1      Q.  Have you ever communicated with

2  Ms. DeFrancesca?

3      A.  No, I have not.

4      Q.  So do you recall any communications with anyone

5  after Ms. DeFrancesca provides that the long-term

6  disability benefit should be 285,000 as opposed to the

7  351,000 Bank of America had determined?

8      A.  I do not.

9      MS. MINER:  I'm going to object that the

10  document speaks for itself in this case.  There's

11  correspondence on this document following the message

12  from Luann DeFrancesca.

13      MS. SIVARAJAH:  Q.  Any other communications,

14  other than what's set forth in the e-mail

15  communications, about whether to pay Mr. Marr the

16  $351,000 calculation based on the rolling method or the

17  285,000 based on the 2008 ABBR?

18      A.  I do not recall any.

19      Q.  Do you remember anyone raising the issue of why

20  the 2009 ABBR should be applied?

21      A.  Other than Mr. Marr, no.

22      Q.  Do you recall any other discussions --

23      A.  And I don't believe, in this time frame, that

24  was on the table.

25      Q.  Okay.  Did anyone at Bank of America raise the

1    issue of whether Mr. Marr should be paid according to

2    the 2009 ABBR?

3        A.    I'm sorry.  Would you repeat that?

4        Q.    I actually think you did mention it.  Never

5    mind.  I'll withdraw the question.

6        A.    Okay.

7        Q.    In Exhibit 7, this is where you initially used

8    the PS, plan sponsor workstation capture, to inquire as

9    to why the 2009 ABBR shouldn't apply.

10        MS. MINER:  Objection.  Mischaracterizes the

11    evidence.

12        THE WITNESS:  Yeah.  I was asking specifically

13    what, if this is the number they were using to calculate

14    his ABBR.  That's the number I would look up and see.

15        MS. SIVARAJAH:  Q.  And I believe you testified

16    you never received a response in this time frame, when I

17    had questioned you earlier.

18        Do you remember, around February 17th, when the

19    amount was being changed to 351,000, whether there was

20    discussion about changing into the 2009 ABBR?

21        MS. MINER:  Objection, mischaracterizes

22    evidence; vague and ambiguous.

23        THE WITNESS:  I do not recall that what we

24    discussed the 2009 ABBR.

25        MS. SIVARAJAH:  Q.  Did anyone investigate

MICHAEL  JOSEPH  -  12/15/2010

Page 81

1  whether Mr. Marr had received a letter in September 2008

2  requiring the 2009 ABBR for his long-term disability

3  payments?

4          MS. MINER:  Objection, mischaracterizes the

5  evidence.

6          THE WITNESS:  We did not.

7          MS. SIVARAJAH:  Q.  And do you know why not?

8      A.    It was irrelevant.  The disability payments

9  were based on the pre-disability earnings, which is

10  2008.

11     Q.    Do you know who -- actually, let's mark this

12  next.  Exhibit 13?

13              (Whereupon, Deposition Exhibit No. 13

14               was marked for identification.)

15         MS. SIVARAJAH:  Q.  Do you know who authored

16  this September 29, 2008, letter?

17     A.    I believe it's someone in our service delivery

18  group.  I don't know who, specifically.

19     Q.    Is it Bank of America global human resources?

20     A.    Service delivery would fall under that broader

21  heading, yes.

22     Q.    Does your pay and escalation group fall under

23  global resources as well?

24     A.    Yes, it does.

25     Q.    Basically, all human resources functions fall

MICHAEL JOSEPH - 12/15/2010

Page 82

1    under this group?

2        A.    That's correct.

3        Q.    Service delivery at this point, in February of

4    2009, was Dineen?

5        A.    Dineen supported leaves for service delivery.

6        Q.    Okay.  So would she be involved in -- do you

7    know if she was involved in delivery of this letter, the

8    December 29, 2008 letter?

9            MS. MINER:  Objection, vague and ambiguous.

10           THE WITNESS:  I don't know.

11           MS. SIVARAJAH:  Q.  How many employees are in

12   the service delivery group?

13       A.    I don't know the exact figure, but I would say

14   about a dozen; 12.

15       Q.    Okay.  Have you ever inquired whether, in

16   Mr. Marr's case or any other case, a record of who the

17   letters was sent out to, the September 29, 2008 letter?

18       A.    I'm sorry.  Have I inquired as to who the

19   letters were sent to?

20       Q.    Yes.

21       A.    I have not.

22       Q.    Do you recall any discussions with anyone about

23   who the letters were sent out to, the September 29,

24   2008, letter?

25       A.    I do not.

1      Q.   Did anyone raise the issue of, especially from

2   the service delivery group, which would be Dineen,

3   whether the September 29, 2008, letter had been sent to

4   Mr. Marr?

5      A.   At some point in 2009 it was not a question.

6   Mr. Marr sent me a copy of the letter he received.

7      Q.   So that was the first time you saw the letter,

8   was when Mr. Marr sent it to you?

9      A.   I believe I had seen the letter before just

10   through, maybe, escalations.

11      Q.   So have you dealt with any other escalation

12   issues, with other individuals, where the September 29,

13   2008, letter was involved in calculating long-term

14   disability benefits?

15      A.   Specifically, no.  Specifically 2009, no.

16      Q.   Do you remember, earlier in 2008, any

17   escalation issues calculating long-term disability

18   benefits?

19      A.   Me personally, no.  I'm guessing we have in our

20   team.

21      Q.   I don't want you to guess.  The admonition

22   earlier.

23      A.   Right.  Thanks.

24      Q.   Without guessing, are you aware, either through

25   discussions with other members of your group or others

1    in Bank of America, whether there were escalation issues

2    regarding the use of the September 29, 2008, letter for

3    calculating long-term disability benefits?

4        A.    I'm not aware of any.

5        Q.    So you had not discussed with anyone about the

6    September 29, 2008, letter until Mr. Marr brought it to

7    your attention.   Is that correct?

8        A.    My recollection, yes, that's correct.

9              MS. SIVARAJAH:  We'll go to Exhibit 14.

10                   (Whereupon, Deposition Exhibit No. 14

11                    was marked for identification.)

12             THE WITNESS:  So this is a continuation.

13             MS. SIVARAJAH:  Yes, continuation from Exhibit

14    12.

15             THE WITNESS:  Okay.

16             MS. SIVARAJAH:  Q.  Have you had a chance to

17    review Exhibit 14?

18        A.    Yes, I have.

19        Q.    And are these series of e-mails ones that you

20    received in the course of your employment with Bank of

21    America?

22        A.    Yes.

23        Q.    The last e-mail in this e-mail chain is a

24    response from Ms. Clymer to Ms. Todd and yourself.  Do

25    you see that?

MICHAEL JOSEPH - 12/15/2010

Page 85

1    A.    Yes, I do.

2    Q.    Okay.  And subsequent to receiving this e-mail

3    that Mr. Marr's "ABBR should be calculated as of the

4    date that you last worked," do you recall any responses

5    that you had to Ms. Clymer?

6    A.    I do not.

7    Q.    Do you recall any further discussions about

8    whether or not to use the amount that is suggested by

9    MetLife here, which is an ABBR of 285,000?

10   A.    I don't recall specific discussions, although I

11   do believe there were some, because I do believe we

12   wound up changing it to the 351,000.

13   Q.    And do you remember why the decision was made

14   to change it to the 351,000?

15   A.    Again, we were giving Mr. Marr the benefit of

16   the doubt of not receiving the 2007 letter that was

17   applicable to 2008 benefits.

18   Q.    And at that time it was your testimony that no

19   one had checked to see if Mr. Marr had received the

20   letter or not.  Is that right?

21   A.    That's correct.

22   Q.    Do you know why -- if you know, do you recall

23   any further responses from MetLife regarding changing

24   Mr. Marr's ABBR to 285,000, sorry, 351,000?

25   A.    Okay.  I do not.

1    itself.

2              THE WITNESS:  I would rather they take my

3    direction, to be frank, but it says here they require

4    payroll records.

5              MS. SIVARAJAH:  Q.  And do you recall providing

6    the payroll record to MetLife?

7         A.   I do not.

8         Q.   Have you ever worked with MetLife, prior to the

9    escalation issue with Mr. Marr, to adjust another

10   employee's long-term disability payments?

11        A.   I have not.

12        Q.   Did you find out from anyone else whether an

13   associate's payroll records need to be submitted in

14   order to perform an adjustment to long-term disability

15   payments?

16        A.   I did not.

17        Q.   Do you recall if anyone disagreed, that the

18   payroll records should not be provided?

19        A.   I do not recall.

20             MS. SIVARAJAH:  Exhibit 16.

21             (Whereupon, Deposition Exhibit No. 16

22                 was marked for identification.)

23             MS. SIVARAJAH:  Q.  Did you receive the chain

24   of e-mails contained in Exhibit 16 in the course of your

25   employment with Bank of America?

1      A.    Yes, I did.

2      Q.    And in the last e-mail, it is from Ms. Todd to

3   Dineen, and it is discussing the response from MetLife

4   to yourself and Ms. Todd regarding the adjustment to

5   Mr. Marr's long-term disability payments.  Correct?

6      A.    Correct.

7      Q.    Okay.  Now, in the e-mail from Ms. Todd, she

8   refers to another instance in which MetLife had made the

9   requested change, and she indicates, third paragraph,

10  "They're pushing back in Bill's case.  Please see the

11  e-mail exchange below with Andrea Clymer."  Do you see

12  that?

13     A.    Yes, I do.

14     Q.    Does this refresh your recollection of the

15  change that MetLife had made to another individual's

16  long-term disability pay at the request of the bank?

17     A.    I recall discussing it.  I don't believe I was

18  in this role when that occurred.

19     Q.    Okay.  Do you recall anything, even if you were

20  not in the role that you currently are?

21        MS. MINER:  Objection, vague and ambiguous.

22        MS. SIVARAJAH:  Q.  Do you recall anything

23  about the other instance of escalation, even if you were

24  not in a managerial capacity with pay and escalation?

25     A.    My recollection is discussing that it had been

1    done before, one other time.

2         Q.    Do you recall if it was done more than once

3    before?

4         A.    I don't know of any other instance it was done.

5         Q.    Do you remember any subsequent communications

6    with Mr. Marr as a result of what MetLife was now

7    informing you about the adjustment to his long-term

8    disability pay?

9         A.    I don't recall a specific conversation with

10   Mr. Marr regarding the increase to three fifty-one, or

11   any push-back we received from MetLife.

12        Q.    Okay.

13        A.    I might have, but I don't recall.

14        Q.    Do you recall any communications with Mr. Marr

15   informing him that he will be getting paid at the

16   $351,000 amount and also that he will be paid the

17   difference?

18        A.    I don't recall specific conversations.  I know

19   we did communicate, I don't know if it was e-mail or

20   verbally, regarding the change to the 351 as well as

21   retro payments.

22        Q.    Do you recall the reasons that MetLife was

23   providing for not changing the amount of the long-term

24   disability from 285,000 to three fifty-one?

25        A.    I don't, other than I just read, per following

MICHAEL JOSEPH - 12/15/2010

1    the plan documents that it was cited in one of the

2    e-mails.

3        Q.   Did you disagree with MetLife, that the plan

4    document did not provide that it would be the 285,000?

5            MS. MINER:  Objection; vague and ambiguous and

6    calls for inadmissible opinion.

7            THE WITNESS:  I don't know that I disagreed.

8    Like I said, I believe we gave them direction to change

9    it, and I think they were pushing -- well, that's

10   opinion.  So.

11           MS. SIVARAJAH:  Q.  So when MetLife -- did

12   MetLife refuse to change the amount from 285- to

13   351,000?

14       A.   I believe they eventually changed it.

15       Q.   Right.  Did they provide you any reason why the

16   $351,000 amount should be used, even though the plan

17   documents say that it should be the two eighty-five,

18   pursuant to the plan documents?

19       A.   The way I heard your question, they didn't

20   provide me any reason as to why three fifty-one should

21   be used.

22       Q.   Okay.  So eventually you just -- withdraw that

23   question.

24           You testified that eventually MetLife changed

25   the amount of long-term disability pay to 351,000.  When

1    they changed it, did they tell you why they decided to

2    change it, in light of the fact that they had earlier

3    told you that the plan documents provided that it should

4    be the 2008 ABBR of 285,000?

5         A.    I don't know why they agreed to that.

6         Q.    Did anyone ask, or do you recall why they

7    changed their mind?

8         A.    I do not.

9              MS. SIVARAJAH:   Next is Exhibit 17.

10             (Whereupon, Deposition Exhibit No. 17

11             was marked for identification.)

12             MS. SIVARAJAH:   Q.   Have you had a chance to

13   review Exhibit 17?

14        A.    Yes, I have.

15        Q.    And are these e-mails that you received in the

16   course of your employment with Bank of America?

17        A.    Yes, they are.

18        Q.    The first e-mail is a response -- the last

19   e-mail, actually, on page 1, is a response to Mr. Marr's

20   e-mail to you that's set forth on page 2 of Exhibit 17,

21   correct?

22        A.    Yes.

23        Q.    Under number 2 you state, "but need 4 SOEs (the

24   oldest ones) that I requested and should be here either

25   tomorrow or Monday."  Do you see that?

1                  (Whereupon, Deposition Exhibit No. 18

2                  was marked for identification.)

3          MS. SIVARAJAH:  Q.  Have you had a chance to

4     review Exhibit 18?

5          A.    Yes, I have.

6          Q.    Did you receive and send these e-mails in the

7     course of your employment with Bank of America?

8          A.    I did.

9          Q.    Okay.  We can go to the second-to-last page,

10    and it starts with an e-mail from yourself to Melissa

11    Dobosz.  Do you see that?

12         A.    I do.

13         Q.    Who is Melissa Dobosz?

14         A.    I don't recall.  I believe she works for

15    MetLife.

16         Q.    So do you recall why Ms. Clymer was not the

17    point of contact in these series of communications?

18         A.    I do not, although she's included later in the

19    chain.

20         Q.    Okay.  Do you recall any communications other

21    than what is set forth in these e-mails with MetLife?

22              MS. MINER:  Objection, vague and ambiguous.

23              MS. SIVARAJAH:  Q.  About adjusting Mr. Marr's

24    long-term disability payment.

25         A.    Outside of these e-mails, I don't recall.

1          Q.    And what I'm asking is, did you talk to anybody

2     after sending the e-mail, or --

3          A.    At some point I did have a conversation with

4     MetLife; our legal as well as their legal.

5          Q.    Do you remember when that happened?

6          A.    I don't.

7          Q.    Do you remember whether it happened before or

8     after the last e-mail in this chain, June 16, 2009?

9          A.    I believe it would have happened after.

10         Q.    Do you recall who initiated it?

11         A.    I don't.

12         Q.    On the first page is an e-mail from you to

13    Melissa, stating, "We adjusted the amount for his STD

14    benefit back in March to reflect what our handbook and

15    the ML plan reflect."  Do you see that?

16         A.    I do.

17         Q.    What is the "ML plan"?

18         A.    MetLife.

19         Q.    And do you recall what the change was to his

20    STD benefits?

21         A.    I -- looking at the, without looking at the

22    e-mails, I don't recall addressing STD.

23         Q.    Is it a typo?

24         A.    I don't know.  We wouldn't involve MetLife in

25    reviewing of his STD benefits.  They're not the provider

1    for that.

2        Q.   For all intents and purposes, the remark is to

3    changing Mr. Marr's long-term benefits earlier in the

4    year to reflect what the handbook and the MetLife plan

5    reflected?

6        A.   I suspect so.  If we're discussing it with

7    MetLife it would be regarding LTD.

8        Q.   And the second sentence states that "Now we are

9    looking to change the LTD ABBR amount to his 2009

10   calculated ABBR, which follows our current policy."  Do

11   you see that?

12       A.   I do.

13       Q.   And when you're referring to the "current

14   policy" are you referring to the 2009 -- sorry,

15   September 29, 2008, letter?

16       A.   I don't know that I'm referring to the letter.

17   I do think this is an unfortunate -- this is a mistake

18   on my part, to try to change it to the 2009 ABBR.

19       Q.   At that point did you believe that the amount

20   should be changed to the 2009 ABBR?

21       A.   It appears I did.

22       Q.   And do you recall why you believed that?

23       A.   I don't remember my rationale at the time.  And

24   in fact, in looking at the e-mails you provided, I

25   specifically instructed that it should be the 2008

1    pre-disability figure.

2        Q.   So you don't remember why you were seeking to

3    change it to the 2009 ABBR?

4        A.   I don't.  It's not fun to read this.

5            MS. MINER:  Before we move on to another

6    document can we take a short break?

7            MS. SIVARAJAH:  Sure.

8            (Off the record.)

9            MS. SIVARAJAH:  Exhibit 19.

10               (Whereupon, Deposition Exhibit No. 19

11               was marked for identification.)

12           MS. SIVARAJAH:  Q.  Have you had a chance to

13   review Exhibit 19, Bates-stamped, on the first page,

14   D02457?

15       A.   Yes, I have.

16       Q.   So we have the same document now.  Are these a

17   series of e-mails that you sent and received during the

18   course of your employment with Bank of America?

19       A.   Yes, they are.

20       Q.   Now, I believe we've discussed the e-mail

21   starting on page 2.  But starting on page 1, the first

22   e-mail at the bottom is from Melissa Dobosz to you on

23   June 17th.  Do you see that?

24       A.   Yes, I do.

25       Q.   So in Ms. Dobosz's e-mail to you, she cites to

MICHAEL JOSEPH - 12/15/2010

Page 101

1    page 97 of the Associate Handbook.  Do you see that?

2        A.   Yes, I do.

3        Q.   And then she states that "per this wording on

4    page 97, the salary calculations are based off of

5    earnings such as the date disability began and not based

6    off earnings as of LTD start date."  Do you see that?

7        A.   Yes, I do.

8        Q.   And were you in agreement with Ms. -- you were

9    not in agreement with Ms. Dobosz's assessment, correct?

10       A.   According to this e-mail, I was not.

11       Q.   And so in your response to Ms. Dobosz, you are

12   attaching the letter, which I believe is the September

13   29th, 2008, letter?  Is that correct?

14       A.   That's what I would guess.  I don't know what I

15   attached.

16       Q.   And you state that "Attached is a letter that

17   is sent to people on leaves," and it specifically says

18   that the ABBR is used, rather than page 97, for LTD

19   benefits.  Do you see that?

20       A.   Yes, I do.

21       Q.   And in the letter that we discussed earlier,

22   Exhibit 13, which is September 29, 2008, on the third to

23   last paragraph, do you see that it states that The ABBR

24   should be used for "long-term disability benefits

25   instead of the average 12-month calculation outlined on

1    page 97 of the Associate Handbook."

2         A.    I do see that.

3         Q.    And is that the reference you're making in

4    Exhibit 19, in your e-mail to Ms. Dobosz on June 23,

5    2009, at 2:48 p.m.?

6         A.    I believe it would be.

7         Q.    And then you also state in the Exhibit 19

8    e-mail communication, quote, "It doesn't make reference

9    to the beginning of the leave or STD."  Do you see that?

10        A.    I do.

11        Q.    And do you recall any response from Ms. Dobosz

12   or anyone at MetLife when you told them that the

13   September 29, 2008, letter "doesn't make reference to

14   the beginning of the leave or STD"?

15        A.    I don't recall a specific response.  However,

16   there were further meetings on this internally and with

17   MetLife in that, reiterating Melissa Dobosz's point of

18   pre-disability earnings is what the benefit is based on.

19        Q.    And did you ever get a response from anyone,

20   whether MetLife or anyone in Bank of America, why the

21   beginning of the leave or the STD was not referenced in

22   the September 29, 2008, letter?

23             MS. MINER:  Objection; compound, vague and

24   ambiguous.

25             THE WITNESS:  I don't know that I did.  I don't

1    know that I inquired.

2              MS. SIVARAJAH:   Q.   Why not?

3        A.   I don't know.   I mean, this specific instance

4    resulted in a meeting and interpretation of the letter

5    and the plan.   And that's where we went.

6        Q.   And you received some information that told you

7    that it was the language that was provided by MetLife

8    that the page 97 letter supersedes the September 29,

9    2008, letter?

10             MS. MINER:   Objection.   Assumes facts not in

11   evidence.   Mischaracterizes evidence and calls for a

12   legal conclusion.

13       A.   In looking at it now, it's strictly, the ABBR

14   letter talks about the calculation of ABBR.   It doesn't

15   reference the fact of the plan year it's applicable to.

16   I beg your pardon.   It does.   It suggests that it's a

17   2009 ABBR.

18       Q.   Okay.   It doesn't make any reference to the

19   beginning of the leave or the short-term disability,

20   correct?

21       A.   Correct.   It merely addresses the calculation

22   for the 2009 plan year.

23             MS. SIVARAJAH:   Exhibit 20.

24             (Whereupon, Deposition Exhibit No. 20

25             was marked for identification.)

MICHAEL JOSEPH - 12/15/2010

1     Q.   Okay.  Do you remember if there was a

2  determination, at the conclusion of that meeting with

3  MetLife and Bank of America, regarding Mr. Marr's

4  long-term disability being adjusted to the 2009 ABBR?

5     A.   I believe the conclusion came afterwards.  That

6  there was a takeaway and then a decision made.  I don't

7  recall the time frame of the decision.

8     Q.   And in this meeting, do you recall any

9  discussions regarding the effect of the September 29,

10  2008, letter?

11         MS. MINER:  Objection, vague and ambiguous.

12         THE WITNESS:  I don't.  At some point, there

13  was discussions on potentially changing the letter or

14  modifying the letter, but I don't know when that came

15  into play.

16         MS. SIVARAJAH:  Q.  Now, we're still focused on

17  this meeting.

18     A.   Right.

19     Q.   Do you recall anyone discussing why the

20  September 29, 2008, letter should not apply to this

21  Marr's calculations?

22     A.   I do not recall.

23         (Whereupon, Deposition Exhibit No. 22

24           was marked for identification.)

25         MS. SIVARAJAH:  Q.  Showing you a series of

MICHAEL JOSEPH - 12/15/2010

Page 112

1    e-mails that you received in the course of your

2    employment with Bank of America, do you recognize this?

3        A.    Yes.

4        Q.    It starts off with your e-mail to Mr. Deal and

5    Ms. Berry.  Do you see that?

6        A.    Yes, I do.

7        Q.    Do you remember having any in-person or phone

8    communications with anyone subsequent to the meeting

9    with MetLife where Mr. Marr's long-term disability

10   benefits were discussed?

11       A.    I don't recall specifically, but as I mentioned

12   before, I believe the decision came after that meeting.

13       Q.    Okay.  How soon after that meeting did it come?

14       A.    I don't know.

15       Q.    Was it a month, or weeks, a day?  Can you give

16   me an estimate?

17       A.    I would say a week or two.

18       Q.    So Richard, do you know if Richard Deal and

19   Holly Berry, if they had been involved in determining

20   whether the 2009 ABBR should be used for Mr. Marr, prior

21   to this communication from you, on July 17th, to them?

22       A.    Yes.  There was an e-mail that's in the stack

23   where Richard explained the 2008 pre-disability earnings

24   should be used.  Additionally, this e-mail talks about

25   how the 2009 ABBR applies to the 2009 plan year.

1          CERTIFICATE OF REPORTER

2          I, KAREN A. FRIEDMAN, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7          That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time and

9    place therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12         That before completion of the deposition,

13   review of the transcript [ ] was [X] was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17         I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22   DATED:    December 23, 2010

23

24   _Karen A. Friedman_

25   KAREN A. FRIEDMAN, CSR No. 5425