IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MARR,<br><br>    Plaintiff,<br><br>  v.<br><br>BANK OF AMERICA, NATIONAL ASSOCIATION,<br><br>    Defendant.<br>                                  / | No. C 09-05978 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |

**INTRODUCTION**

In this suit concerning employment expenses and disability benefits, the parties cross-move for partial summary judgment. For the reasons discussed below, plaintiff's motion for partial summary judgment is **DENIED**. Defendant's motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

Plaintiff William Marr was hired as a mortgage loan officer by defendant in 2004. His job was to sell mortgages. He was successful at his job and was honored as a "platinum performer," meaning he was among the top five percent of performers for loan sales in the company. Plaintiff was a full-time employee paid by commission. A written compensation plan that governed the terms and conditions of his employment and pay was issued on an annual basis (Pl. Dep. 32–36, 126–28).

The second amended complaint presents eight claims, as follows: (1) failure to reimburse business expenses (Cal. Labor Code § 2802), (2) unlawful wage deductions (Cal.

1  Labor Code § 221), (3) failure to pay wages (Cal. Labor Code § 200 *et seq.*), (4) breach of
2  contract, (5) breach of the covenant of good faith and fair dealing, (6) violation of California
3  Business and Professions Code § 17200 *et seq.*, (7) fraud, and (8) negligent misrepresentation
4  (Dkt. No. 32).

**ANALYSIS**

The parties cross-motions seek summary judgment not only as to some claims and not others, but also, in some cases, as to *parts of individual claims* and not other parts of those same claims. In other words, the motions address certain theories of relief that touch mere parts of claims. Plaintiff moves for summary judgment or partial summary judgment as to claims one, two, and six. Defendant moves for summary judgment as to all of claims four, five, seven, and eight, and for partial summary judgment as to claims one, two, three, and six.

Due to the potentially confusing nature of the parties' motions, this order will proceed to address each claim in turn, specifying for each which party is moving for summary judgment as to that claim, in whole or in part, and the merits of such motion, once narrowed.

### A.    CLAIM ONE: FAILURE TO REIMBURSE BUSINESS EXPENSES (CAL. LABOR CODE § 2802)

As to this claim under California Labor Code Section 2802, plaintiff moves for summary judgment. The elements of a claim under Section 2802 are: (i) the employee made expenditures or incurred losses; (ii) the expenditures or losses were incurred in direct consequence of the employee's discharge of his or her duties, or obedience to the directions of the employer; and (iii) the expenditures or losses were reasonable and necessary. *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 568 (2007). In addition, the employer "must either know or have reason to know that the employee has incurred [the] expense." *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901 (N.D. Cal. 2009) (Chen, M.J.). The parties agree on these requirements.

The briefing and the record are *replete* with genuine issues of material fact as to *each* of the requirements to make out this claim. Much of plaintiff's briefing on this claim consists of conclusory statements that the elements are satisfied and fact arguments that should be appropriately reserved for the trier of fact. Plaintiff claims he is due $348,364.50, yet the whole

2

extent of evidence submitted to reach this figure consists of conclusory numbers set forth in a declaration without any specific substantiation. Worse, it appears that the numbers in plaintiff's declaration do not even add up to the asserted total. Plaintiff's motion for summary judgment as to this claim is therefore **DENIED**.

One additional point must be made: As to this claim the complaint states that defendant failed to reimburse plaintiff for expenses incurred "in the process of [] travel [for purposes of selling mortgages] . . . including but not limited to: millage; costs for promotional materials; the salary of his assistant . . . ; cellular phone charges; enticements provided to potential customers or actual customers to complete a sale; office expenses including the purchase of computer software and office supplies; long distance phone charges; meal charges and other business related expenses incurred in the course of his employment." Yet plaintiff's motion claims he is entitled to reimbursement for *additional* "expenses" including donations to charity and "loan expenses" (which expenses will be discussed in detail below) including rate extension fees, relock fees, application fees, and underage charges (Br. 11).

The latter category of additional expenses are not part of this suit. "[W]here, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (citations omitted). In reply, plaintiff argues that it is sufficient that the complaint "specifically states that he is claiming that The Bank failed to reimburse his business expenses" (Reply 8). Including an allegation that a claim for reimbursement of business expenses includes business expenses generally does not provide defendant with notice that in addition to defending against this claim for enumerated "marketing expenses," defendant must also defend against this claim for unenumerated expenses of unknown other types. Contrary to plaintiff, this does not comply with pleading requirements.

**B.    CLAIM TWO: UNLAWFUL WAGE DEDUCTIONS (CAL. LABOR CODE § 221)**

As to this claim under California Labor Code Section 221, both sides move. (Defendant's brief states that it is only moving for partial summary judgment on this claim, but its arguments do not reflect a limiting principle, and go to the whole claim.) The complaint

3

states as to this claim that defendant illegally charged plaintiff for certain expenses including the salary of his assistant, closing costs, loan processing fees, extension fees, underage charges, uncollected/waived fee charges, misquote and rate-lock failure charges, and curtailment charges. The parties present separate arguments concerning plaintiff's assistants' salaries and all other expenses, so they will be addressed separately.

### 1. Non-Assistant Expenses

#### i) Characteristics of Defendant's Compensation Plan

Under defendant's compensation policy, mortgage loan officers were responsible for any uncollected fee relative to the loans sold by that officer. For example, the plan stated that "[a]ll reduced, waived or uncollected fees . . . are carried forward against future compensation and are recoverable before future compensation is earned . . ." (2007 Compensation Plan at 14). Several specific types of expenses must be explained further.

*Underage and PFUN charges*: Each day mortgage loan officers were provided a rate sheet which listed the mortgage rates the officers could offer (Pl. Dep. 37–38). Defendant's "underage" policy — incorporated into each of its compensation plans — allowed mortgage loans officers to undercut the published price, by lowering the rate or waiving fees, and sell loans at an "underage" in order to secure a loan in a competitive situation (2006 Compensation Plan at 9–10; 2007 Plan at 13; and 2008 Plan at 124–25; P1. Dep. 147–48). Under the terms of the policy, by offering underage to a customer, a mortgage loan officer was "agree[ing] to cover 50% of [the] allowable underage[]" him- or herself, by a reduction of commission. The underages "[we]re carried forward against future compensation . . ." It was always the mortgage loan officer's choice to incur underage.

"PFUN" — a type of underage — stands for pricing flexibility underage. Use of PFUN by a mortgage loan officer had to be approved by his or her manager and the regional manager (Perry Dep. 208–09, 211–12; Pl. Dep. 221–26, 228–29, 246). Again, this type of underage was used to be competitive with other lenders' rates, but there was a different mechanism for determining who paid for a PFUN underage versus a regular underage. The parties dispute

4

whether mortgage loan officers sometimes versus never had to cover part of PFUN expenses (Def. Br. 6; Pl. Opp. 17 n.13).

*Loan processing/application fees*: At the time a customer applied for a mortgage loan he or she had to submit an application fee. Alternatively, the customer could have the application fee wrapped into the mortgage, *i.e.*, closing costs were increased to cover the application fee (Marr Decl. ¶ 20; Perry Dep. 179–81). Occasionally, the loan processing center "forgot to include [the application fee] in the final document" (Marr Decl. ¶ 20). In such instances, the amount of the application fee was deducted from the mortgage loan officer's commissions.

*Rate-lock charges*: Once a customer agreed to a mortgage, the quoted rate would be locked in for a certain time. Rate locks existed so the rate would not change as the loan process and paperwork were completed (Perry Dep. 181). If everything proceeded as planned, and the loan closed prior to the end of the rate-lock period, the mortgage loan officer was paid his or her standard commission. If, however, the mortgage process could not be completed during this rate-lock period, the rate lock would need to be extended, and the mortgage loan officer would be charged a fee for such extension (Perry Dep. 182; Marr Decl. ¶ 21). Alternatively, if the original rate lock was allowed to expire, the mortgage loan officer pay a rate relock fee, rather than requiring the customer to pay a different rate, in the amount of the difference between the old and new rates (Perry Dep. 183; Marr Decl. ¶ 22). In this way, mortgage loan officers were "[a]ccountable for any revenue shortfall to Bank of America resulting from any misquotes or rate lock errors" (Perry Dep. Ex. 27 at D03826). Plaintiff argues that such expenses were taken out of commissions even when it was not the mortgage loan officer's fault that the rate lock had expired.

The compensation plan explained that "failures to lock rates as requested by or promised to the customer will be treated as underages and will be the sole responsibility of the MLO. They are carried forward against future compensation, and accumulated underages are recoverable before future compensation is earned" (2007 Compensation Plan at 14).

5

1    The compensation plans also held the mortgage loan officers responsible for
2 uncollected/waived fees, misquotes, and curtailments. A curtailment occurred when a customer
3 paid off the balance of a loan within 60 days after funding. These were all "carried forward
4 against future compensation."

### ii) **Explanation of Law and Application to Defendant's Plan**

California Labor Code Section 221 provided at all relevant times: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." The most recent and comprehensive interpretation of this code section by the California Supreme Court is found in the decision of *Prachasaisoradej v. Ralphs Grocery Co., Inc.*, 42 Cal.4th 217 (2007), which held that a bonus system at Ralphs Grocery did not violate California law. In that case, "the [bonus plan at issue] did not create an expectation of or entitlement to a specified wage, then take deductions or contributions from that wage to reimburse Ralphs for its business costs." Instead, "ordinary business expenses . . . were figured in . . . to determine the store's profit, upon which the supplementary incentive compensation payments were calculated." *Id.* at 223–24.

In *Ralphs*, the California Supreme Court drew distinctions between legal and illegal plans explored in past cases, and specified the characteristics of the Ralphs plan that made it permissible under Section 221. "By the [Ralphs] Plan's terms, it was *only after* the [business] had completed the relevant period of operation, and the resulting profit or loss figure was then derived, that it was possible to determine, by a further comparison to the preset targets, whether Plan participants were entitled to a supplementary incentive compensation payment, and if so, how much." *Id.* at 229 (emphasis in original). The distinction made was between a plan that provides a wage, makes deductions, and then provides a reduced wage, and a plan that does not provide a wage amount until costs are taken into account. The latter was what *Ralphs* approved.

*Ralphs* reviewed and distinguished past decisions that disapproved of schemes in which — as just stated — there were predictable pre-deduction wage amounts, such as "a scheduled amount based on sales volume and revenue," or "a specified and promised share of the revenues

6

attributable to that employee's personal sales or managerial efforts." *Id.* at 233, 236. Plaintiff relies extensively on *Kerr's Catering*, *Quillian*, and *Hudgins*, but *Ralphs* considered those decisions in providing superseding principles to be implemented by courts in deciding whether compensation schemes comply with Section 221.

This order finds that the principles in *Ralphs* dictate that defendant's compensation scheme complied with Section 221. Defendant's plan did *not* create predictable pre-deduction wage amounts, such as "a scheduled amount based on sales volume and revenue," or "a specified and promised share of the revenues attributable to that employee's personal sales or managerial efforts." *Ralphs*, 42 Cal.4th at 233, 236. Accordingly, *Kerr's Catering*, *Quillian*, and *Hudgins* do not dictate a contrary result. Instead, by holding mortgage loan officers responsible for expenses related to the loans they sold before calculating the commission earned on those loans, "it was *only after* . . . the resulting profit or loss figure was [] derived, that it was possible to determine, by a further comparison to [] preset targets," the amount of commission a mortgage loan officer was entitled to on each loan under the plan. *Id.* at 229 (emphasis in original).

Plaintiff argues that important distinctions between the plan in *Ralphs* and defendant's plan here are that there, "unlike here, the employees were eligible for a bonus on top of their full standard wage and the bonus was calculated on a business[-]wide basis" (Opp. 12 n.8). *First*, *Ralphs* did not hold that the legality of a compensation scheme turns on whether all compensation is paid by commission as opposed to part-fixed-wage-part-bonus. *Second*, *Ralphs* does not require a different result just because defendant's plan did not calculate commissions on a business-wide basis. True, *Ralphs* acknowledged that "the potential for deceit seems greater where the employer, claiming specific losses or shortages, charges them against an individual employee's pay than where it distributes, among a group of employees, a share of its profits." 42 Cal.4th at 240. Yet California law equally approves of schemes that make individualized wage adjustments attributable directly to the employee's conduct, as here. *See Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1336 (2006) (explaining that, in *Hudgins*, the employer's "practice of recovering commissions on identified returns *was* acceptable because

those chargebacks were specifically tied to the sales in which the associate had been involved and for which the associate had received a direct benefit in the form of a commission" (emphasis in original)).

Plaintiff argues that the plan at issue here held the mortgage loan officers responsible for expenses "wholly outside [of their] control" (Opp. 16). That is not a fair characterization of the plan. It held the mortgage loan officers responsible for expenses that related directly to the calculation of profit generated by their own sales of loans. It did not make them responsible for the expenses of the company generally. *Ralphs* recognized that *calculating expenses is a necessary part of calculating profits, from which a wage can be paid*. That is what defendant's plan did for commissions based on the profits generated by each loan sale to be paid to employees such as plaintiff.

Therefore, defendant's compensation plan did not violate California Labor Code Section 221 as to the non-assistant expenses challenged by plaintiff. Accordingly, this order need not analyze defendant's other arguments in support of its motion for summary judgment as to these expenses. Defendant's motion for summary judgment as to the claim for unlawful wage deductions of non-assistant expenses is **GRANTED**, and plaintiff's motion as to this claim is **DENIED**.

### 2. Assistant Salary Expenses

Plaintiff had two assistants, Kristen Hampton and Lisa Madsen, and it is unclear which of these two is targeted by plaintiff's complaint, though it appears from his motion papers to be both. Assuming he can properly challenge expenses related to both assistants, it appears that prior to hiring the second assistant (Ms. Madsen), plaintiff stated in writing that he was "willing to pay [her] directly out of [his] own commissions" (Weil Decl. Exh. T). Thereafter, portions of his commissions were reserved and diverted to pay the company back for paying the assistant's salary. Portions of plaintiff's commissions also went to pay bonuses to his first assistant, Ms. Hampton. Plaintiff argues that these diversions violated Labor Code Section 221.

California Labor Code Section 224 states: "The provisions of Sections 221, 222 and 223 shall in no way make it unlawful for an employer to withhold or divert any portion of an

8

employee's wages . . . when a deduction is expressly authorized in writing by the employee to cover . . . deductions not amounting to a rebate or deduction from the standard wage arrived at by collective bargaining or pursuant to wage agreement or statute . . ." Plaintiff argues in opposition that Section 224 only covers items "that are for the benefit of the employee, not the employer." *City of Oakland v. Hassey*, 163 Cal. App. 4th 1477, 1501 (2008). This understanding is consistent with the nature of Section 224 as an exception to Section 221, which prohibits deductions made for the benefit of the employer.

There seems to be no dispute between the parties concerning the details of the system actually implemented to divert portions of plaintiff's commissions to pay for parts of the salaries of his two assistants. Ms. Hampton, the first assistant, was paid by defendant, but she was also paid a bonus out of plaintiff's commissions. Ms. Madsen was paid only from plaintiff's commissions. The main disputes are over (i) whether plaintiff initiated and/or consented to paying Hampton's bonuses; (ii) whether plaintiff needed to or did initiate or consent to pay Ms. Madsen's bonus in addition to her base salary; and (iii) whether the deductions were primarily for plaintiff's or defendant's benefit. The record is not clear on these issues. They are triable issue of fact that are material to whether the system in effect during plaintiff's employment regarding his assistants' salary expenses violated Labor Code Section 221. Accordingly, both parties' motions for summary judgment on this issue are **DENIED**.

**C.     CLAIM THREE: FAILURE TO PAY WAGES (CAL. LABOR CODE § 200 *ET SEQ.*)**

As to this claim under California Labor Code Section 200 *et seq.*, defendant moves for partial summary judgment. Plaintiff's complaint states that defendant refused to pay him: (1) the full extent of long-term disability benefits that were due to him under their agreement, and (2) bonuses for "over 40 referrals" due to him under their agreement. Defendant only moves for summary judgment as to the first theory. Defendant makes four arguments for why the long-term disability benefits theory cannot proceed: (1) it is preempted by ERISA, (2) plaintiff has not exhausted internal remedies, (3) Bank of America is not the proper defendant, and (4) payments were accurate. Plaintiff went on medical leave in July 2008 and initially received short-term disability benefits; he began collecting long-term disability benefits

9

1 in January 2009. This order need not go into the details of why plaintiff alleges in this suit that
2 his long-term disability benefits were inaccurately calculated, because his claims based on this
3 theory of recovery must be dismissed due to his failure to exhaust internal remedies prior to
4 bringing suit, as now explained.

**1.      State-Law Claim Preempted by ERISA**

Defendant argues that plaintiff's state law claims concerning long-term disability payments are precluded as preempted by ERISA. The parties agree that the benefits plan is subject to ERISA. "[A]s a suit by a beneficiary to recover benefits from a covered plan, it falls directly under § 502(a)(1)(B) of ERISA, which provides an exclusive federal cause of action for resolution of such disputes." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 62–63 (1987). "In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004).

Plaintiff "complain[s] only about denials of coverage promised under the terms of [an] ERISA-regulated employee benefit plan[]." *Davila*, 542 U.S. at 211. Therefore, under clearly established law, plaintiff's state-law long-term disability claims are preempted.

Far from claiming an independent legal duty apart from ERISA, plaintiff concedes that his state-law claims are preempted and instead argues that they should be allowed to "morph[] into an ERISA claim" (Opp. 21). Plaintiff cites *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990), but in fact that decision held that ERISA preempted a state-law wrongful discharge claim. The decision of *Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1391 (9th Cir. 1995), however, is instructive:

> In their motion opposing summary judgment, [plaintiffs] asked that, should the District Court find their state law claims preempted, they be given relief under ERISA's civil enforcement scheme instead, 29 U.S.C. § 1132(a). . . .
>
> Having determined that ERISA preempts the [plaintiffs'] state law claims, the District Court, consistent with the [plaintiffs'] pleadings and other evidence, should have taken up the question of relief under ERISA's civil enforcement scheme. . . . The Crulls requested as much, and their claim falls within the scope of ERISA's enforcement scheme, for it seeks "to recover benefits due . . . under the terms of [the] plan. . . ." 29 U.S.C. § 1132(a). Whether, once all the evidence

10

is considered, the [plaintiffs] are entitled to damages is a question we leave to the
District Court to answer on remand.

We must follow the direction of our court of appeals, and proceed with plaintiff's long-term disability benefits theory of relief as an ERISA claim, while precluding the state-law claims as independent claims to the extent they rely on this theory. Therefore, this order shall next address whether plaintiff's ERISA claim can proceed after proper exhaustion of internal remedies.

### 2. Failure to Exhaust Internal Remedies

Defendant next argues that plaintiff's long-term disability benefits claims fail because he has failed to exhaust the internal remedies specified in the plan. The plan stated:

> 6.7. <u>Legal Actions</u>. No legal action concerning the claim may be brought unless and until all of the following have occurred:
>
> (a) The claimant has submitted a proper written claim.
>
> (b) The claimant has been notified that the claim is denied.
>
> (c) The claimant has filed a written appeal with the review fiduciary for review of the denied claim.
>
> (d) The claimant has been notified in writing of the decision of the review fiduciary or the review fiduciary has failed to take any action on the request for review within the time prescribed above.

(Joseph Decl. Exh. 1 at 2139). Plaintiff first submitted a written claim to MetLife on November 8, 2010. It was denied on December 8. This is not enough to exhaust the claim under the plan language just stated, as plaintiff must next file a written appeal. On January 7, 2011, plaintiff filed a written appeal with MetLife (Dkt. No. 43 Exh. 1). No decision has been rendered on the appeal.

"[F]ederal courts have the authority to enforce the exhaustion requirement in suits under ERISA, and [] as a matter of sound policy they should usually do so . . . [unless for example] when resort to the administrative route is futile or the remedy inadequate." *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980) (citations omitted). Plaintiff argues that he should be excused from exhaustion because he was not provided "meaningful access to claims procedures."

*First*, plaintiff states that he made "repeated requests to recalculate his disability benefits," and neither defendant nor MetLife provided a written denial (Opp. 22). Yet there is

11

no evidence that plaintiff submitted a *written claim* as required by the plan language above, until November 8, 2010. Under the terms of the plan, no written denial was previously warranted.

*Second*, plaintiff states that he "was never provided notice of th[e] claim process . . . while he attempted to correct the amount of LTD benefits with The Bank," and that "on two separate occasions . . . The Bank agreed to recalculate his benefits, without instructing him to seek recourse with MetLife or . . . in writing" (Opp. 22). His declaration states: "At no point during my communications with Bank of America's representatives was I ever informed to review any LTD plan documents or to pursue any internal claims processes with MetLife regarding decisions related to recalculating my LTD benefits" (Marr Decl. ¶ 24). Yet plaintiff in fact had access online or by request to the plan description in defendant's Associate Handbook, the Bank of America Group Benefits Program, and the Bank of America Long Term Disability Benefits Plan, which outlined claim and appeal procedures (Pl. Dep. 162–65 and Exhs. 27–28; Joseph Decl. Exhs. 1–3).

Although plaintiff seems to argue that defendant should be estopped from asserting lack of exhaustion when its employees failed to mention the plan's claim process to plaintiff, regardless of his access to the plan documents, that argument is precluded by law. "A plaintiff cannot avail himself of a federal ERISA estoppel claim based upon statements of a plan employee which would enlarge his rights against the plan beyond what he could recover under the unambiguous language of the plan itself." *Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 822 (9th Cir. 1992). Plaintiff in no way claims that the plan itself provides for a loophole to the exhaustion requirement; it is unambiguous in that regard. Plaintiff was on notice of the process through the written documents that outlined the claim procedures. He was not denied meaningful access to claim procedures.

*Third*, plaintiff argues that exhaustion would have been futile because "The Bank and MetLife had informed him that his claim to recalculate his LTD benefits pursuant to the September 2008 letter would not be allowed . . . he was instructed that there were no other remedies available" (Opp. 22). Plaintiff's brief cites no evidence for this proposition. As such,

it cannot be credited. Plaintiff's assertion of futility is, moreover, undermined by the fact that when plaintiff finally did pursue the administrative claim process, he received a written response precisely as contemplated by the plan. There is no evidence of futility.

For this reason, plaintiff's long-term disability benefits claims, proceeding as an ERISA claim, must be dismissed for lack of proper exhaustion of internal remedies. *See Amato*, 618 F.2d at 569. This order will therefore not analyze whether Bank of America is the right party against whom plaintiff must assert an ERISA claim or whether benefits were in fact awarded consistent with the plan, which are defendant's next arguments in support of its motion for summary judgment as to these claims. Plaintiff's claim for failure to pay long-term disability benefits is **DISMISSED WITHOUT PREJUDICE** to bringing a properly-exhausted ERISA claim in a later suit. Again, plaintiff's claim for failure to pay bonuses for "over 40 referrals" due to him remains, as defendant did not move for summary judgment as to that claim.

### D.   CLAIM FOUR: BREACH OF CONTRACT

As to this claim for breach of contract, defendant moves for summary judgment. Plaintiff's complaint states that defendant refused to pay the full extent of long-term disability benefits that were due to him under their agreement. Defendant argues that this claim should be dismissed for the same reasons outlined above for the long-term disability benefits theory of recovery in claim three. For the same reasons, plaintiff's fourth claim is **DISMISSED WITHOUT PREJUDICE** to bringing a properly-exhausted ERISA claim in a later suit.

### E.   CLAIM FIVE: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

As to this claim for breach of the covenant of good faith and fair dealing, defendant moves for summary judgment. The complaint bases this claim on three theories:

1. That defendant set mortgage rates at an elevated level in order to deprive plaintiff of commissions;
2. That defendant prevented plaintiff from receiving referrals from banking centers and prevented him from closing referrals he received from banking centers; and
3. That defendant compensated plaintiff for his long-term disability at a lower rate than what was called for in their agreement.

13

Defendant argues that judgment should be entered against the first two theories primarily because an implied covenant cannot impose new duties on the contracting parties beyond those in the agreement. Plaintiff did not oppose this portion of defendant's motion, so it is **GRANTED**.

As to the third theory, defendant argues that this claim should be dismissed for the same reasons outlined above for the long-term disability benefits theory of recovery in claim three. For the same reasons, plaintiff's fifth claim based on recovery of long-term disability benefits is **DISMISSED WITHOUT PREJUDICE** to bringing a properly-exhausted ERISA claim in a later suit.

### F.   CLAIM SIX: VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 *ET SEQ.*

As to this claim for violation of California Business and Professions Code Section 17200 *et seq.*, plaintiff moves for summary judgment or partial summary judgment, and defendant moves for partial summary judgment. The parties agree that this claim is derivative of plaintiff's other claims, so it is **GRANTED IN PART AND DENIED IN PART** to the extent that judgment has been granted or reserved as to the other originating claims.

### G.   CLAIM SEVEN: FRAUD

As to this claim for fraud, defendant moves for summary judgment. The elements of fraud include: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996) (citations omitted). Plaintiff's complaint states that defendant misrepresented that all mortgage loan officers were required to participate in PFUN. The complaint further states that defendant knew that representation to be false because defendant did not charge other mortgage loan officers PFUN charges.

Defendant argues that it is entitled to summary judgment on this claim because plaintiff cannot prove intent, justifiable reliance, or damages (because they are speculative). Plaintiff did not oppose this portion of defendant's motion, so it is **GRANTED**.

### H.   CLAIM EIGHT: NEGLIGENT MISREPRESENTATION

As to this claim for negligent misrepresentation, defendant moves for summary judgment. The elements of negligent misrepresentation include: "(1) a misrepresentation of a

14

past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages." *Fox v. Pollack*, 181 Cal. App. 3d 954, 962 (1986). Again, the complaint states that defendant misrepresented that all mortgage loan officers were required to participate in PFUN, and that defendant knew that representation to be false because defendant did not charge other mortgage loan officers PFUN charges.

Defendant argues that it is entitled to summary judgment on this claim because plaintiff cannot prove negligence, justifiable reliance, or damages (because they are speculative). Plaintiff did not oppose this portion of defendant's motion, so it is **GRANTED**.

### I.  CLAIMS ONE, TWO, AND THREE LIMITED IN TIME

Defendant lastly argues that the portions of plaintiff's first, second, and third claims arising before 2006 are barred by prior settlement, and the statute of limitations bars any claims before August 20, 2005. Plaintiff does not oppose the latter contention. Therefore, the remaining issue is whether such claims between August 20, 2005, and December 31, 2005 are viable.

Plaintiff was a class member in the class action suit *Franklin v. Bank of America, N.A.*, Case No. 05-cv-00519 CRB. The class settlement agreement released, among other things, the following claims:

> [A]ny and all wage-and-hour claims, whether known or unknown, arising during the period from December 20, 2000 to December 31, 2005 . . . whether or not such claims are in the nature of claims for damages, unpaid wages, premium pay, waiting-time penalties, or other penalties for overtime, missed meal periods, missed rest breaks, and other alleged wage-and-hour violations . . . The Class Member's [sic] Released Claims include, but are not limited to, claims arising from or dependent on the California Labor Code; . . . California Business and Professions Code section 17200 *et seq.*; the California common law of contract and tort . . .

(Dkt. No. 67 Exh. B). This release was sent in proposed form in a notice to class members, who were then given an opportunity to opt out of the class before final approval. Plaintiff did not opt out and received a settlement check for $5195.45 (Weil Decl. Exh. KK).

15

1    Plaintiff does not contest that this release applies to him. Plaintiff argues, however, that
2 the terms of the release do not apply to the claims he brings here. This order finds that the
3 release language is sufficiently ambiguous as to whether a reasonable class member like
4 plaintiff would have understood and thus received notice that it applies to claims such as those
5 asserted here to bar them at this time. Instead, the jury will decide whether the release
6 extinguishes these claims.

7    Thus, for now plaintiff may only pursue claims one, two, and three beginning from
8 August 20, 2005. Defendant's motion for summary judgment as to a limitation in time
9 to plaintiff's first, second, and third claims is **GRANTED IN PART AND DENIED IN PART**.

### J.   REQUESTS FOR JUDICIAL NOTICE

The parties both request that judicial notice be taken of certain facts and documents submitted in support of their motions (Dkt. Nos. 67, 75, 87, 90). FRE 201 governs judicial notice of adjudicative facts and states: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Moreover, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." *Ibid.*; *see also United States v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003).

Along with his opening brief, plaintiff requests judicial notice of the following facts:

1. That the IRS standard business mileage rate for 2007 was 48.5 cents per [mile].
2. That the IRS standard business mileage rate from January 1, 2008 until June 30, 2008 was 50.5 cents per mile.
3. That the IRS standard business mileage rate from July 1, 2008 until December 31, 2008 was 58.5 cents per mile.

As these are not adjudicative facts considered by this order, judicial notice will not be taken of them. Therefore, plaintiff's request for judicial notice is **DENIED**. Along with its opening brief, defendant requests that judicial notice be taken of:

16

1. The February 22, 1993 Opinion Letter of the California Division of Labor Standards Enforcement entitled "Re: Mortgage Loan Officer Commissions."

2. The Order for Final Class Approval of Class Action Settlement entered in the Northern District of California on July 20, 2006 in the matter of *Franklin v. Bank of America, N.A.*, No. C 05-00529 CRB.

These documents both contain adjudicative facts considered by this order and are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Therefore, defendant's request for judicial notice is **GRANTED**.

Along with their replies in support of their motions, plaintiff requests that judicial notice be taken of an Opinion Letter of the California Division of Labor Standards Enforcement from 2000, and defendant requests that judicial notice be taken of an Opinion Letter of the California Division of Labor Standards Enforcement from 2008. Neither of these letters contain adjudicative facts considered by this order. Moreover, it is not fair play to submit new material in reply, leaving the other side no opportunity to respond. Therefore, the parties' second requests for judicial notice are **DENIED**.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is **DENIED**, and defendant's motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**. To recap, summary judgment is granted against the following: claims one and three prior to August 20, 2005; claim two as to non-assistant expenses; claim five as to the non-disability benefits theories; claim six to the extent it is derivative of other claims for which judgment has been rendered; and claims seven and eight. Claims three, four, and five based on recovery of long-term disability benefits are dismissed without prejudice to bringing a properly-exhausted ERISA claim in a later suit. This action will proceed on the following claims: claim one beginning from August 20, 2005, claim two as to plaintiff's assistants' salaries beginning from August 20, 2005, claim three based on failure to pay bonuses for referrals beginning from August 20, 2005, and claim six to the extent it is derivative of other claims for which judgment has been reserved. The jury will decide whether claims one, two, and three are barred prior to

January 1, 2006, by the *Franklin* release. The parties shall appear for the previously-scheduled pretrial conference on April 11, 2011, at 3:00 p.m.

**IT IS SO ORDERED.**

Dated: March 8, 2011.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE